ANDERSEN CONSULTING, LLP *v.* GENE GAVIN,
COMMISSIONER OF REVENUE SERVICES
(SC 16296)

Borden, Norcott, Katz, Palmer and Sullivan, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued November 29, 2000—officially released March 27, 2001

*Richard K. Greenberg*, assistant attorney general, with whom were *Joan C. G. Grear*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellant (defendant).

*Charles H. Lenore*, with whom was *Michael A. Bucci*, for the appellee (plaintiff).

*Richard W. Tomeo, John R. Shaughnessy, Jr.,* and *Linda L. Morkan* filed a brief for the Connecticut Business and Industry Association, Inc., as amicus curiae.

*Opinion*

BORDEN, J. The issue in this appeal is whether payments made pursuant to certain contracts entered into by the plaintiff, Andersen Consulting, LLP (Andersen), with Connecticut Natural Gas (gas company) and with Northeast Utilities (electric company), were subject to sales and use taxes as sales of computer and data processing services[1] pursuant to General Statutes (Rev. to 1993) § 12-407 (2) (i) (A).[2] The defendant, Gene Gavin,

[1] With respect to whether the services at issue were subject to the sales and use tax, the parties dispute only whether the services were computer and data processing services. We, therefore, limit our analysis accordingly.

[2] General Statutes (Rev. to 1993) § 12-407 (2) provides: " 'Sale' and 'selling' mean and include: (a) Any transfer of title, exchange or barter, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration; (b) any withdrawal, except a withdrawal pursuant to a transaction in foreign or interstate commerce, of tangible personal property from the place where it is located for delivery to a point in this state for the purpose of the transfer of title, exchange or barter, conditional or otherwise, in any manner or by any means whatsoever, of the property for a consideration; (c) the producing, fabricating, processing, printing or imprinting of tangible personal property for a consideration for consumers who furnish either directly or indirectly the materials used in the producing, fabricating, processing, printing or imprinting, including but not limited to, computer programming, sign construction, photofinishing, duplicating and photocopying; (d) the furnishing and distributing of tangible personal property for a consideration by social clubs and fraternal organizations to their members or others; (e) the furnishing, preparing, or serving for a consideration of food, meals or drinks; (f) a transaction whereby the possession of property is transferred but the seller retains the title as security for the payment of the price; (g) a transfer for a consideration of the title of tangible personal property which has been produced, fabricated or printed to the special order of the customer, or of any publication, including but not limited to, computer programming, sign construction, photofinishing, duplicating and photocopying; (h) a transfer for a consideration of the occupancy of any room or rooms in a hotel or lodging house or space in a campground for a period of thirty consecutive calendar days or less; (i) the rendering of certain services for a consideration, exclusive of such services rendered by an employee for his employer, as follows: (A) Computer and data processing services, including but not limited to, time, (B) credit information and

the commissioner of revenue services (commissioner),

reporting services, (C) services by employment agencies and agencies providing personnel services, (D) private investigation, protection, patrol work, watchman and armored car services, (E) painting and lettering services, (F) photographic studio services, (G) telephone answering services, (H) stenographic services, (I) services to industrial, commercial or income-producing real property, including but not limited to, such services as management, electrical, plumbing, painting and carpentry and excluding any such services rendered for the voluntary containing or removing of hazardous waste, provided income-producing property shall not include property used exclusively for residential purposes in which the owner resides and which contains no more than three dwelling units, or a housing facility for low and moderate income families and persons owned by an organization which has as one of its purposes the ownership of housing for low and moderate income families, and which organization has been granted exemption from federal income taxation, (J) business analysis, management, management consulting and public relations services, (K) services providing 'piped-in' music to business or professional establishments, (L) flight instruction and chartering services by a certificated air carrier on an aircraft, the use of which for such purposes, but for the provisions of subsection (4) of section 12-410 and subsection (12) of section 12-411, would be deemed a retail sale and a taxable storage or use, respectively, of such aircraft by such carrier, (M) motor vehicle repair services, including any type of repair, painting or replacement related to the body or any of the operating parts of a motor vehicle, (N) motor vehicle parking, including the provision of space, other than metered space, in a lot having thirty or more spaces, other than space in a seasonal parking lot provided by a person who is exempt from taxation under this chapter pursuant to subsection (1), (5) or (8) of section 12-412 or in a parking lot (i) owned or leased under the terms of a lease of not less than ten years duration and (ii) operated by an employer for the exclusive use of its employees, and car washing services, excluding coin-operated car washes, (O) radio or television repair services, (P) furniture reupholstering and repair services, (Q) repair services to any electrical or electronic device, including but not limited to, such equipment used for purposes of refrigeration or air-conditioning, (R) health and athletic club services, exclusive of any such services provided without any additional charge which are included in any dues or initiation fees paid to any such club, which dues or fees are subject to tax under section 12-543, (S) tax preparation services, (T) lobbying or consulting services for purposes of representing the interests of a client in relation to the functions of any governmental entity or instrumentality, (U) services of the agent of any person in relation to the sale of any item of tangible personal property for such person, exclusive of the services of a consignee selling works of art, as defined in subsection (b) of section 12-376c, or articles of clothing or footwear intended to be worn on or about the human body other than (i) any special clothing or footwear primarily designed for athletic activity or

appeals from the judgment of the trial court, in favor

protective use and which is not normally worn except when used for the athletic activity or protective use for which it was designed and (ii) jewelry, handbags, luggage, umbrellas, wallets, watches and similar items carried on or about the human body but not worn on the body in the manner characteristic of clothing intended for exemption under subdivision (47) of section 12-412, under consignment, (V) locksmith services, (W) advertising or public relations services, including layout, art direction, graphic design, mechanical preparation or production supervision, not related to the development of media advertising or cooperative direct mail advertising, (X) landscaping and horticulture services, (Y) window cleaning services, (Z) maintenance services, (AA) janitorial services, (BB) exterminating services, (CC) swimming pool cleaning and maintenance services, (DD) renovation and repair services as set forth in this subparagraph, to other than industrial, commercial or income-producing real property: Paving of any sort, painting or staining, wallpapering, roofing, siding and exterior sheet metal work, (EE) amusement and recreation services included in major group 79 in the Standard Industrial Classification Manual, United States Office of Management and Budget, 1987 edition, excluding dance lessons and any such service provided (i) by a person who is exempt from taxation under this chapter pursuant to subsection (1), (5) or (8) of section 12-412 or in a facility owned or managed by a person who is exempt from taxation under this chapter pursuant to subsection (1) of section 12-412, except when the service entitles the patron to participate in an athletic or sporting activity which is not organized exclusively for patrons under the age of nineteen and (ii) without any additional charge which is included in any admissions charge, dues or initiation fees paid to any retailer, which charge, dues or fees are subject to the tax imposed under section 12-541 or 12-543, (FF) miscellaneous personal services included in industry group 729 in the Standard Industrial Classification Manual, United States Office of Management and Budget, 1987 edition, exclusive of services rendered by massage therapists licensed pursuant to chapter 384a and (GG) any repair or maintenance service to any item of tangible personal property including any contract of warranty or service related to any such item; (j) the leasing or rental of tangible personal property of any kind whatsoever, including but not limited to, motor vehicles, linen or towels, machinery or apparatus, office equipment and data processing equipment, provided for purposes of this subdivision and the application of sales and use tax to contracts of lease or rental of tangible personal property, the leasing or rental of any motion picture film by the owner or operator of a motion picture theater for purposes of display at such theater shall not constitute a sale within the meaning of this subsection; (k) the rendering of telecommunications service, as defined in subsection (26) of this section, for a consideration on or after January 1, 1990, exclusive of any such service rendered by an employee for his employer, subject to the provisions related to telecommunications service in accordance with section 12-407a; (*l*) the rendering of community antenna televi-

of Andersen, determining that the payments were not subject to the tax.[3] The commissioner claims that the payments at issue were subject to sales and use taxes as sales of computer services pursuant to General Statutes (Rev. to 1993) §§ 12-408 (2)[4] and 12-407 (2) (i) (A) and

sion service, as defined in subsection (27) of this section, for a consideration on or after January 1, 1990, exclusive of any such service rendered by an employee for his employer; (m) the rendering of transportation service, as defined in subsection (28) of this section, for a consideration on or after October 1, 1991, exclusive of any such service rendered by an employee for his employer; (n) the transfer for consideration of space or the right to use any space for the purpose of storage or mooring of any noncommercial vessel. Wherever in this chapter reference is made to the sale of tangible personal property or services, it shall be construed to include sales described in this subsection, except as may be specifically provided to the contrary."

The legislature has amended § 12-407 (2) several times since 1993. The only amendment that is relevant to this appeal is that enacted as Public Acts 2000, No. 00-174, § 71 (P.A. 00-174). See footnote 11 of this opinion for the text of P.A. 00-174. Hereafter, unless otherwise indicated, all references to § 12-407 (2) are to the 1993 revision of that statute.

We note that the taxation of computer and data processing services is being phased out pursuant to General Statutes (Rev. to 1999) § 12-408 (1) (C), as amended by P.A. 00-174, § 4, and General Statutes (Rev. to 1999) § 12-411 (1) (D), as amended by P.A. 00-174, § 6.

[3] The commissioner appealed from the judgment of the trial court to the Appellate Court, and, upon the joint motion of Andersen and the commissioner, we transferred the appeal to this court pursuant to Practice Book § 65-2 and General Statutes § 51-199 (c).

[4] General Statutes (Rev. to 1993) § 12-408 (2) provides: "Retailer collects tax from consumer. Credit allowed for tax remitted to state on worthless account receivable. Reimbursement for the tax hereby imposed shall be collected by the retailer from the consumer and such tax reimbursement, termed 'tax' in this and the following subsections, shall be paid by the consumer to the retailer and each retailer shall collect from the consumer the full amount of the tax imposed by this chapter or an amount equal as nearly as possible or practicable to the average equivalent thereof. Such tax shall be a debt from the consumer to the retailer, when so added to the original sales price, and shall be recoverable at law in the same manner as other debts except as provided in section 12-432a. Whenever such tax, payable by the consumer (A) with respect to a charge account or credit sale occurring on or after July 1, 1984, is remitted by the retailer to the commissioner and such sale as an account receivable is determined to be worthless and is actually written off as uncollectible for federal income tax purposes or (B) to a retailer who computes taxable income, for purposes of taxation under the Internal Revenue Code of 1986, or any subsequent

## § 12-426-27[5] of the Regulations of Connecticut State

corresponding internal revenue code of the United States, as from time to time amended, on the cash basis method of accounting with respect to a sale occurring on or after July 1, 1989, is remitted by the retailer to the commissioner and such sale as an account receivable is determined to be worthless, the amount of such tax remitted may be credited against the tax due on the sales tax return filed by the retailer for the monthly or quarterly period, whichever is applicable, next following the period in which such amount is actually so written off, but in no event shall such credit be allowed later than three years following the date such tax is remitted. The commissioner shall, by regulations adopted in accordance with chapter 54, provide standards for proving any such claim for credit. If any account with respect to which such credit is allowed is thereafter collected by the retailer in whole or in part, the amount so collected shall be included in the sales tax return covering the period in which such collection occurs. The tax applicable in any such case shall be determined in accordance with the rate of sales tax in effect at the time of the original sale."

Although § 12-408 (2) has been amended several times since 1993, those amendments are not relevant to this appeal.

[5] Section 12-426-27 of the Regulations of Connecticut State Agencies provides: "Enumerated services

"(a) The rendering of the following enumerated services for a consideration, defined in subsection (b) of this regulation, in this state on or after July 1, 1975, shall be a sale and subject to the sales tax. Any person or entity rendering such services must register with the Commissioner of Revenue Services and must collect the tax due thereon from the purchaser. Such retailers shall pay the taxes so collected in the manner and form as other retailers licensed as such to sell tangible personal property in this state. A ' purchaser may issue a resale certificate only in those instances where said services are being resold without change.

"(b) Enumerated services.

"(1) Computer and data processing services.

"Such services mean and include providing computer time, storing and filing of information, retrieving or providing access to information, designing, implementing or converting systems providing consulting services, and conducting feasibility studies. The transfer of dominion and control of computer hardware and software for a consideration does not come within the purview of this section, since such transfer shall constitute a lease or rental of tangible personal property and be subject to tax under Section 12-426-25.

"(2) Credit information and reporting services.

"Such services include but are not limited to the assembling and evaluating of information regarding the credit standing, creditworthiness, or credit capacity of any individual, corporation, partnership or other type of entity, for the purpose of furnishing and disseminating written or oral credit reports.

"(3) Collection services; employment and personnel services.

"(a) Collection services mean and include the calling for and receiving

Agencies, and that such an interpretation has recently

of accounts, bills and other indebtedness from a debtor on the behalf of a creditor. Such services are provided for a consideration by a collection agency, whether or not licensed by the state of Connecticut to engage in such services.

"(b) Employment services mean and include the procurement or offer to procure for a consideration: Jobs or positions for those seeking employment; or employees for employers seeking the services of employees.

"(c) Personnel services mean and include furnishing temporary or part-time help to others by means of employing such temporary and part-time help directly.

"(4) Repealed, April 23, 1991.

"(5) Private investigation, protection, patrol, watchman and armored car services.

"Such services mean and include providing personnel or canines to patrol or guard property; engaging in detective or investigative duties; safeguarding or maintaining a surveillance of an individual; maintaining and monitoring mechanical protective devices, such as burglar and fire alarm systems; providing armored cars for the transportation of valuables; wrapping coins; setting up a payroll; and the rendering of police services by an off-duty policeman.

"(6) Sign painting and lettering services.

"Such services include painting and lettering of indoor or outdoor signs, the painting and lettering of names, trademarks, or logos on store fronts, buildings, billboards, motor vehicles, concrete, and marble.

"(7) Interior design and decorating services.

"Such services shall include but not be limited to the selection, procurement and arrangement of the surface coverings, draperies, furniture, furnishings, and other decorations for the interior of a home or building, counseling with respect to such decorations, and services incidental thereto. Such services do not include the sale of tangible personal property.

"(8) Telephone answering services.

"Such services include transmitting of telephone messages to the clients of those engaged in the business of providing such services.

"(9) Stenographic services.

"Such services mean and include typing, taking shorthand, and taking and transcribing dictation for others for a consideration.

"(10) Repealed, April 23, 1991.

"(11) Services providing 'piped-in' music to business or professional establishments.

"Such services mean and include providing background music to industrial, commercial, or professional establishments for a consideration, where such music is supplied to customers by radio transmission, telephone lines, and other means.

"(c) When the services enumerated in subsection (b) are performed by an employee for his employer, the wages, salaries or other compensation

been ratified by the legislature. We reverse the judgment of the trial court.

The trial court found the following facts. Andersen, an Illinois limited liability partnership with an office in Connecticut, has extensive experience in developing information computer programs for utility companies. The gas company is a Connecticut public utility that provides local gas distribution to various areas of the state. Finding that its information system, which it developed in 1972 and which was performed manually, was old and outdated, the gas company decided, in 1991, to acquire new computer information systems to manage its financial, accounting and cost control functions. Specifically, it decided that it needed two systems to update its informational systems, the first

received by the employee do not constitute receipts subject to the Sales and Use Tax.

"(d) The services enumerated in subdivisions (b) (1), (2), (4) and (5) are usually rendered in the form of a report by the service agency to its customer. Such reports are taxable, whether given in written, oral or any other form, if delivered to or intended for use in the State of Connecticut.

"(e) Collection services rendered by a collection agency are taxable if the collection is made on behalf of a creditor located in Connecticut.

"(f) Protection, patrol or watchman services rendered in connection with property located in Connecticut are taxable. Armored car services are taxable when the service is provided to a Connecticut client.

"(g) Employment services are taxable if the agency rendering such services procures a job or position in a Connecticut business for a person seeking employment. If a job or position is procured without the state, such services are not taxable.

"(h) Personnel services are taxable if the agency rendering such services furnishes temporary or part-time help to a Connecticut business seeking such help. If temporary or part-time help is furnished to a business without the state, such services are not taxable.

"(i) Interior decorating and design services are taxable when rendered in connection with property located in Connecticut.

"(j) Service agencies providing any of the services enumerated in subsection (b) are considered to be consumers of all tangible personal property consumed in the performance of such services.

"(k) The term 'includes' when used in a definition contained in this regulation shall not be deemed to exclude other things otherwise within the meaning of the term defined."

of which was a customer information system (customer system), which would manage billing, accounts receivable, customer service, credit and collection, marketing and the dispatching of customer service personnel. The second system was a distribution and construction information system (distribution system), which would manage planning, cost estimating and cost analysis relating to the installation of gas mains in the streets served by the gas company. The gas company's main purpose was to obtain computer software systems that would meet the business requirements of the company. It had assembled a team to search for a system that would meet these requirements of the company. The team considered off-the-shelf, or canned, software, but found that such software could not be modified by the user, and that it would become very expensive to tie into an existing system. Thus, the team decided that it needed a customized information system.

After reviewing various proposals, the gas company selected Andersen to develop the customer and the distribution systems. In developing the customer system, Andersen modified its Customer 1 software to meet the gas company's requirements. Approximately 60 percent of its requirements could be met through the use of the Customer 1 software in developing the customer system; the remaining 40 percent was custom developed by Andersen. The custom work included the development of a meter inventory system, the creation of a marketing system to keep track of marketing and sales efforts and to target prospective customers, and the development of a means to integrate an existing computer aided dispatching system with the customer system. In developing the distribution system, Andersen used its core package of software known as Work 1. Work 1 met approximately 85 percent of the gas company's requirements for the distribution system; the remaining 15 percent was custom developed by Ander-

sen. The custom work included the development of a system that would automatically schedule maintenance for equipment used in the field, and a means to integrate the distribution system with the customer system. Andersen and the gas company entered into two contracts (gas company contracts), one for each system.[6] Both contracts were fixed fee contracts with the fees contingent on the delivery by Andersen of a fully functioning software system in accordance with the agreed upon specifications. The product that resulted from the development of the systems remained the property of Andersen after the fulfillment of the contracts. The gas company received, however, a perpetual, nonexclusive license to use and modify the software. Andersen's fees under the gas company contracts were $12,979,000. Andersen collected a sales and use tax from the gas company with respect to the two contracts and remitted the payments to the commissioner.

In 1988, the electric company had no unified system for accounting, budgeting and work management functions, and had eleven informational systems in operation, which were inadequate. The electric company explored the use of canned software. Some software was developed in-house where commercial software was not available. The electric company established a task force to conduct a feasibility study to evaluate its systems and make recommendations for improvement. The goal of the task force was to develop a system that would permit the electric company to monitor and budget for costs on a detailed level so that costs could be controlled more effectively. The task force recommended replacing existing systems with a management information and budgeting system (management system), which could only be done with the use of custom

---

[6] The record also indicates that there were two agreements related to the customer system—one agreement for phase I and another agreement for phase II.

software because the canned software met only 20 to 25 percent of the electric company's requirements.

Andersen and the electric company entered into a contract (electric company contract), and used a team approach to create the software for the management system. The electric company provided the space and 50 percent of the staffing for the project. Andersen provided consulting services for architecture and engineering in the development and construction of the software. The management system began with a core package of canned software known as the Dunn and Bradstreet (McCormack and Dodge) Series M General Ledger software package, which provided for 20 to 25 percent of the management system's functional requirements. The remaining 75 to 80 percent was custom developed by a joint team of Andersen's and the electric company's personnel. Andersen's fees under the electric company contract were $15,826,601. Upon delivery, Andersen transferred to the electric company all intangible rights to the management system software, but retained rights to certain tools used in the development of the software.

From June 1, 1990, to October 31, 1993, the gas company and the electric company made payments to Andersen pursuant to the contracts previously described. Andersen collected sales and use taxes from both companies with respect to those payments. After remitting the sales and use taxes imposed on the contracts in question, Andersen requested a refund from the commissioner in the amount of $1,438,828—$525,522 attributable to the gas company contracts and $913,306 attributable to the electric company contract—based upon amounts charged in connection with the development, license and sale of the custom software. The commissioner granted Andersen a refund of $76,500 for payments that Andersen had received from the gas company for license fees. The commissioner denied

Andersen's claim for the balance of the refund claimed with respect to the gas company contracts and for the entire refund claim with respect to the electric company contract.

Andersen appealed from the denials of the commissioner to the trial court pursuant to General Statutes (Rev. to 1993) § 12-422.[7] After a trial, the trial court found that the true object of the contracts was "to provide computer software programs that would meet [the] business needs [of the gas company and the electric company]." The court also stated that the true object was "the creation of informational systems for both [companies], not the creation of the various elements necessary to reach the final product." The court concluded that "these software programs, and the labor used to produce these programs, are not taxable under

[7] General Statutes (Rev. to 1993) § 12-422 provides: "Any taxpayer aggrieved because of any order, decision, determination or disallowance of the commissioner of revenue services under section 12-418, 12-421 or 12-425 may, within one month after service upon the taxpayer of notice of such order, decision, determination or disallowance, take an appeal therefrom to the superior court for the judicial district of Hartford-New Britain, which shall be accompanied by a citation to the commissioner of revenue services to appear before said court. Such citation shall be signed by the same authority, and such appeal shall be returnable at the same time and served and returned in the same manner, as is required in case of a summons in a civil action. The authority issuing the citation shall take from the appellant a bond or recognizance to the state of Connecticut, with surety to prosecute the appeal to effect and to comply with the orders and decrees of the court in the premises. Such appeals shall be preferred cases, to be heard, unless cause appears to the contrary, at the first session, by the court or by a committee appointed by it. Said court may grant such relief as may be equitable and, if such tax has been paid prior to the granting of such relief, may order the treasurer to pay the amount of such relief, with interest at the rate of nine per cent per annum, to the aggrieved taxpayer. If the appeal has been taken without probable cause, the court may tax double or triple costs, as the case demands; and, upon all such appeals which are denied, costs may be taxed against the appellant at the discretion of the court, but no costs shall be taxed against the state."

Although § 12-422 has been amended several times since 1993, those amendments are not relevant to this appeal.

the sales or use tax statutes." The trial court reasoned, on the basis of its understanding of this court's decision in *Northeast Datacom, Inc.* v. *Wallingford*, 212 Conn. 639, 644–46, 563 A.2d 688 (1989), that "all computer software is nontaxable as intangible property regardless [of] whether the software is 'off the shelf' or custom designed." Accordingly, the court rendered judgment for Andersen, ordering the commissioner to refund to Andersen $1,362,328, with interest. This appeal followed.

Before reaching the commissioner's claims, we briefly address the applicable standard of review. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. Practice Book [§ 60-5, formerly § 4061]; *United Illuminating Co.* v. *Groppo*, 220 Conn. 749, 752, 601 A.2d 1005 (1992); *Zachs* v. *Groppo*, 207 Conn. 683, 689, 542 A.2d 1145 (1988); *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980)." (Internal quotation marks omitted.) *SLI International Corp.* v. *Crystal*, 236 Conn. 156, 163, 671 A.2d 813 (1996). Furthermore, "[w]e review the trial court's ruling from the premise that, when the issue is the imposition of a tax, rather than a claimed right to an exemption or a deduction, the governing authorities must be strictly construed against the commissioner and in favor of the taxpayer. *Zachs* v. *Groppo*, [supra, 689]; *Texaco Refining & Marketing Co.* v. *Commissioner*, 202 Conn. 583, 588, 522 A.2d 771 (1987); *Schlumberger Technology Corporation* v. *Dubno*, 202 Conn. 412, 420–23, 521 A.2d 569 (1987)."

*Hartford Parkview Associates Ltd. Partnership* v. *Groppo*, 211 Conn. 246, 249–50, 558 A.2d 993 (1989).

The question of whether the creation of custom software is subject to the sales tax presents a question of statutory interpretation. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Id.; *Carpenteri-Waddington, Inc.* v. *Commissioner of Revenue Services*, 231 Conn. 355, 362, 650 A.2d 147 (1994); *United Illuminating Co.* v. *Groppo*, [supra, 220 Conn. 755–56]." (Internal quotation marks omitted.) *Bortner* v. *Woodbridge*, 250 Conn. 241, 258–59, 736 A.2d 104 (1999). Moreover, "[o]ur rules of statutory construction apply to administrative regulations. . . . *Diamond* v. *Marcinek*, [226 Conn. 737, 744 n.8, 629 A.2d 350 (1993)]; *Preston* v. *Dept. of Environmental Protection*, 218 Conn. 821, 829 n.9, 591 A.2d 421 (1991)." (Internal quotation marks omitted.) *Vitti* v. *Allstate Ins. Co.*, 245 Conn. 169, 178, 713 A.2d 1269 (1998).

I

The commissioner claims that the trial court improperly concluded that the payments at issue, made to Andersen pursuant to the gas company and the electric company contracts, were not subject to sales and use taxes. Specifically, the commissioner claims that the payments at issue were taxable as computer services

pursuant to §§ 12-408 (2)[8] and 12-407 (2) (i) (A),[9] and § 12-426-27[10] of the Regulations of Connecticut State Agencies. The commissioner also contends that the trial court: (1) failed to apply the definition of "computer services" pursuant to § 12-426-27 of the regulations; and (2) misinterpreted and misapplied this court's decision in *Northeast Datacom, Inc.* v. *Wallingford,* supra, 212 Conn. 639. The commissioner further contends that his decision that the services at issue are taxable computer services has been ratified by recent legislation, namely, Public Acts 2000, No. 00-174, §§ 71, 74 (P.A. 00-174).[11]

---

[8] See footnote 4 of this opinion for the text of § 12-408 (2).

[9] See footnote 2 of this opinion for the text of § 12-407 (2) (i) (A).

[10] See footnote 5 of this opinion for the text of § 12-426-27.

[11] Public Act 00-174, § 71, provides: "Subsection (2) of section 12-407 of the general statutes, as amended by section 10 of public act 99-173, section 10 of public act 99-285 and section 1 of this act, is repealed and the following is substituted in lieu thereof:

"(2) 'Sale' and 'selling' mean and include: (a) Any transfer of title, exchange or barter, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration; (b) any withdrawal, except a withdrawal pursuant to a transaction in foreign or interstate commerce, of tangible personal property from the place where it is located for delivery to a point in this state for the purpose of the transfer of title, exchange or barter, conditional or otherwise, in any manner or by any means whatsoever, of the property for a consideration; (c) the producing, fabricating, processing, printing or imprinting of tangible personal property for a consideration for consumers who furnish either directly or indirectly the materials used in the producing, fabricating, processing, printing or imprinting, including but not limited to, sign construction, photofinishing, duplicating and photocopying; (d) the furnishing and distributing of tangible personal property for a consideration by social clubs and fraternal organizations to their members or others; (e) the furnishing, preparing, or serving for a consideration of food, meals or drinks; (f) a transaction whereby the possession of property is transferred but the seller retains the title as security for the payment of the price; (g) a transfer for a consideration of the title of tangible personal property which has been produced, fabricated or printed to the special order of the customer, or of any publication, including but not limited to, sign construction, photofinishing, duplicating and photocopying; (h) a transfer for a consideration of the occupancy of any room or rooms in a hotel or lodging house for a period of thirty consecutive calendar days or less; (i) the rendering of certain services for a consideration, exclusive of such services rendered by an employee for his employer, as follows: (A) *Computer and data processing services, including but not limited to,*

*time, programming, code writing, modification of existing programs, feasibility studies and installation and implementation of software programs and systems even where such services are rendered in connection with the development, creation or production of canned or custom software or the license of custom software,* and exclusive of services rendered in connection with the creation, development hosting or maintenance of all or part of a web site which is part of the graphical, hypertext portion of the Internet, commonly referred to as the World-Wide Web, (B) credit information and reporting services, (C) services by employment agencies and agencies providing personnel services, (D) private investigation, protection, patrol work, watchman and armored car services, exclusive of services of off-duty police officers and off-duty fire fighters, (E) painting and lettering services, (F) photographic studio services, (G) telephone answering services, (H) stenographic services, (I) services to industrial, commercial or income-producing real property, including but not limited to, such services as management, electrical, plumbing, painting and carpentry and excluding any such services rendered in the voluntary evaluation, prevention, treatment, containment or removal of hazardous waste, as defined in section 22a-115, or other contaminants of air, water or soil, provided income-producing property shall not include property used exclusively for residential purposes in which the owner resides and which contains no more than three dwelling units, or a housing facility for low and moderate income families and persons owned or operated by a nonprofit housing organization, as defined in subsection (29) of section 12-412, (J) business analysis, management, management consulting and public relations services, excluding (i) any environmental consulting services, and (ii) any training services provided by an institution of higher education licensed or accredited by the Board of Governors of Higher Education pursuant to section 10a-34, (K) services providing 'piped-in' music to business or professional establishments, (L) flight instruction and chartering services by a certificated air carrier on an aircraft, the use of which for such purposes, but for the provisions of subsection (4) of section 12-410 and subsection (12) of section 12-411, would be deemed a retail sale and a taxable storage or use, respectively, of such aircraft by such carrier, (M) motor vehicle repair services, including any type of repair, painting or replacement related to the body or any of the operating parts of a motor vehicle, (N) motor vehicle parking, including the provision of space, other than metered space, in a lot having thirty or more spaces, excluding (i) space in a seasonal parking lot provided by a person who is exempt from taxation under this chapter pursuant to subsection (1), (5) or (8) of section 12-412, (ii) space in a parking lot owned or leased under the terms of a lease of not less than ten years' duration and operated by an employer for the exclusive use of its employees, (iii) valet parking provided at any airport, and (iv) space in municipally-operated railroad parking facilities in municipalities located within an area of the state designated as a severe nonattainment area for ozone under the federal Clean Air Act, (O) radio or television repair services, (P) furniture reupholstering and repair services, (Q) repair services to any electrical or electronic device, including

but not limited to, such equipment used for purposes of refrigeration or air-conditioning, (R) lobbying or consulting services for purposes of representing the interests of a client in relation to the functions of any governmental entity or instrumentality, (S) services of the agent of any person in relation to the sale of any item of tangible personal property for such person, exclusive of the services of a consignee selling works of art, as defined in subsection (b) of section 12-376c, or articles of clothing or footwear intended to be worn on or about the human body other than (i) any special clothing or footwear primarily designed for athletic activity or protective use and which is not normally worn except when used for the athletic activity or protective use for which it was designed and (ii) jewelry, handbags, luggage, umbrellas, wallets, watches and similar items carried on or about the human body but not worn on the body in the manner characteristic of clothing intended for exemption under subdivision (47) of section 12-412, under consignment, exclusive of services provided by an auctioneer, (T) locksmith services, (U) advertising or public relations services, including layout, art direction, graphic design, mechanical preparation or production supervision, not related to the development of media advertising or cooperative direct mail advertising, (V) landscaping and horticulture services, (W) window cleaning services, (X) maintenance services, (Y) janitorial services, (Z) exterminating services, (AA) swimming pool cleaning and maintenance services, (BB) renovation and repair services as set forth in this subparagraph, to other than industrial, commercial or income-producing real property: Paving of any sort, painting or staining, wallpapering, roofing, siding and exterior sheet metal work, (CC) miscellaneous personal services included in industry group 729 in the Standard Industrial Classification Manual, United States Office of Management and Budget, 1987 edition, exclusive of (i) services rendered by massage therapists licensed pursuant to chapter 384a, and (ii) services rendered by a hypertrichologist licensed pursuant to chapter 388, (DD) any repair or maintenance service to any item of tangible personal property including any contract of warranty or service related to any such item, (EE) business analysis, management or managing consulting services rendered by a general partner, or an affiliate thereof, to a limited partnership, provided (i) that the general partner, or an affiliate thereof, is compensated for the rendition of such services other than through a distributive share of partnership profits or an annual percentage of partnership capital or assets established in the limited partnership's offering statement, and (ii) the general partner, or an affiliate thereof, offers such services to others, including any other partnership. As used in subparagraph (EE)(i) 'an affiliate of a general partner' means an entity which is directly or indirectly owned fifty per cent or more in common with a general partner; and (FF) notwithstanding the provisions of section 12-412, except subsection (87) thereof, patient care services, as defined in subsection (30) of this section by a hospital; (j) the leasing or rental of tangible personal property of any kind whatsoever, including but not limited to, motor vehicles, linen or towels, machinery or apparatus, office equipment and data processing equipment,

We agree. We base our conclusion on the necessarily retroactive application of P.A. 00-174, § 71.

The principles by which we determine the effect of a subsequent statutory amendment on earlier legislation are well established. "We recognize the usual presumption that, in enacting a statute, the legislature intended a change in existing law. *Shelton* v. *Commissioner*, 193 Conn. 506, 513, 479 A.2d 208 (1984); *Vartuli* v. *Sotire*, 192 Conn. 353, 364 n.12, 472 A.2d 336 (1984); 1A J. Sutherland, Statutory Construction (4th Ed. Sands 1984) § 22.30. This presumption, however, like any other, may be rebutted by contrary evidence of the

provided for purposes of this subdivision and the application of sales and use tax to contracts of lease or rental of tangible personal property, the leasing or rental of any motion picture film by the owner or operator of a motion picture theater for purposes of display at such theater shall not constitute a sale within the meaning of this subsection; (k) the rendering of telecommunications service, as defined in subsection (26) of this section, for a consideration on or after January 1, 1990, exclusive of any such service rendered by an employee for his employer, subject to the provisions related to telecommunications service in accordance with section 12-407a; (*l*) the rendering of community antenna television service, as defined in subsection (27) of this section, for a consideration on or after January 1, 1990, exclusive of any such service rendered by an employee for his employer; (m) the transfer for consideration of space or the right to use any space for the purpose of storage or mooring of any noncommercial vessel, exclusive of dry or wet storage or mooring of such vessel during the period commencing on the first day of November in any year to and including the thirtieth day of April of the next succeeding year; (n) the sale for consideration of naming rights to any place of amusement, entertainment or recreation within the meaning of subdivision (3) of section 12-540. Wherever in this chapter reference is made to the sale of tangible personal property or services, it shall be construed to include sales described in this subsection, except as may be specifically provided to the contrary." (Emphasis added.)

Public Act 00-174, § 74, provides: "The intent of subsections (2), (13), (31) and (32) of section 12-407 of the general statutes, as amended by sections 71 to 73, inclusive, of this act is to clarify that current law subjects the sale of canned software to sales and use taxes as a sale of tangible personal property and subjects the sale of computer and data processing services, as defined in said sections, to sales and use taxes as a sale of services constituting a sale in accordance with subsection (2) of section 12-407 of the general statutes, as amended by this act."

legislative intent in the particular case. *Shelton* v. *Commissioner*, supra, 513–14." *State* v. *Magnano*, 204 Conn. 259, 277, 528 A.2d 760 (1987).

"In determining the intended effect of a later enactment on earlier legislation, two questions must be asked. 'First, was the act intended to *clarify* existing law or to *change* it? Second, if the act was intended to make a change, was the change intended to operate retroactively?' . . . *Circle Lanes of Fairfield, Inc.* v. *Fay*, 195 Conn. 534, 540, 489 A.2d 363 (1985)." (Emphasis in original.) *State* v. *Magnano*, supra, 204 Conn. 277.

"Whether to apply a statute retroactively or prospectively depends upon the intent of the legislature in enacting the statute. See, e.g., [id., 284]. In order to determine the legislative intent, we utilize well established rules of statutory construction. Our point of departure is General Statutes § 55-3, which states: No provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have retrospective effect. The obligations referred to in the statute are those of substantive law. . . . Thus, we have uniformly interpreted § 55-3 as a rule of *presumed* legislative intent that statutes affecting *substantive* rights shall apply prospectively only. *Coley* v. *Camden Associates, Inc.*, 243 Conn. 311, 316, 702 A.2d 1180 (1997). This presumption in favor of prospective applicability, however, may be rebutted when the legislature clearly and unequivocally expresses its intent that the legislation shall apply retrospectively. *In re Daniel H.*, 237 Conn. 364, 372, 678 A.2d 462 (1996); accord *Bayusik* v. *Nationwide Mutual Ins. Co.*, 233 Conn. 474, 483–84, 659 A.2d 1188 (1995); *Miano* v. *Thorne*, 218 Conn. 170, 175, 588 A.2d 189 (1991). Where an amendment is intended to clarify the original intent of an earlier statute, it necessarily has retroactive effect. . . . *Toise* v. *Rowe*, 243 Conn. 623, 628, 707 A.2d 25

(1998). We generally look to the statutory language and the pertinent legislative history to ascertain whether the legislature intended that the amendment be given retrospective effect. See, e.g., *Reliance Ins. Co.* v. *American Casualty Co. of Reading, Pennsylvania,* 238 Conn. 285, 290, 679 A.2d 925 (1996); *Rice* v. *Vermilyn Brown, Inc.,* 232 Conn. 780, 787, 657 A.2d 616 (1995)." (Emphasis in original; internal quotation marks omitted.) *Colonial Penn Ins. Co.* v. *Bryant,* 245 Conn. 710, 718–19, 714 A.2d 1209 (1998).

A brief review of the relevant statutory and regulatory framework is necessary to our resolution of the present case. Although the question of whether the payments at issue are subject to sales and use taxes requires our analysis of several statutory and regulatory provisions, our starting point is our sales tax statute, § 12-408. General Statutes (Rev. to 1993) § 12-408 (1)[12] provides in

---

[12] General Statutes (Rev. to 1993) § 12-408 (1) provides: "Imposition and rate of sales tax. For the privilege of making any sales as defined in subsection (2) of section 12-407, at retail, in this state for a consideration, a tax is hereby imposed on all retailers at the rate of six per cent of the gross receipts of any retailer from the sale of all tangible personal property sold at retail or from the rendering of any services constituting a sale in accordance with subdivision (i) of subsection (2) of section 12-407 except, in lieu of said rate of six per cent, (A) at a rate of five and one-half per cent of the gross receipts of any retailer from the sale of any repair or replacement parts exclusively for use in machinery, as defined in subsection (34) of section 12-412, used directly in a manufacturing or agricultural production process, (B) at a rate of twelve per cent with respect to each transfer of occupancy, from the total amount of rent received for such occupancy of any room or rooms in a hotel or lodging house for the first period of not exceeding thirty consecutive calendar days, (C) at a rate of four and one-half per cent of the gross receipts of any retailer from the sale of any motor vehicle to any person who is a member of the armed forces of the United States and is on full-time active duty in Connecticut but whose permanent residence is in another state and (D) with respect to the sales of vessels to any resident of another state, at a rate which is the lesser of: (i) Six per cent of the gross receipts of any retailer from such sales or (ii) the percentage of such gross receipts that is payable as a sales tax by retailers engaged in business in the purchaser's state of residence, provided such retailer requires and maintains an affidavit or other evidence, satisfactory to the commissioner, concerning the purchaser's state of residence. The rate of tax imposed

relevant part: "For the privilege of making any sales as defined in subsection (2) of section 12-407, at retail, in this state for a consideration, a tax is hereby imposed on all retailers at the rate of six per cent of the gross receipts of any retailer from the sale of all tangible personal property sold at retail or from the rendering of any services constituting a sale in accordance with subdivision (i) of subsection (2) of section 12-407 . . . ." Section 12-408 (1) expressly provides that the services upon which it imposes a sales tax are those "services constituting a sale in accordance with subdivision (i) of subsection (2) of section 12-407 . . . ."

We therefore turn to § 12-407 (2), which provides in relevant part: " 'Sale' and 'selling' mean and include . . . (i) the rendering of certain services for a consideration, exclusive of such services rendered by an employee for his employer, as follows: (A) *Computer and data processing services*, including but not limited to, time . . . ." (Emphasis added.) Although no more expansive definition of "[c]omputer and data processing services" was provided by the 1993 revision of the General Statutes, the regulations provided such a definition.[13]

by this chapter shall be applicable to all retail sales upon the effective date of such rate, except that a new rate which represents an increase in the rate applicable to the sale shall not apply to any sales transaction wherein a binding sales contract without an escalator clause has been entered into prior to the effective date of the new rate and delivery is made within ninety days after the effective date of the new rate. For the purposes of payment of the tax imposed under this section, any retailer of services taxable under subdivision (i) of subsection (2) of section 12-407 who computes taxable income, for purposes of taxation under the Internal Revenue Code of 1986, or any subsequent corresponding internal revenue code of the United States, as from time to time amended, on an accounting basis which recognizes only cash or other valuable consideration actually received as income and who is liable for such tax only due to the rendering of such services, may make payments related to such tax for the period during which such income is received, without penalty or interest, without regard to when such service is rendered."

[13] In this connection, we note that General Statutes (Rev. to 1993) § 12-426 (1) provides in relevant part: "The commissioner shall enforce the

Section 12-426-27 (a) of the regulations provides that the rendering of the services enumerated in § 12-426-27 (b) for a consideration shall be a sale and subject to the sales tax. Subsection (b) (1) of § 12-426-27 includes, as one of the enumerated services, "[c]omputer and data processing services." Subsection (b) (1) of § 12-426-27 defines such services to "mean and include providing computer time, storing and filing of information, retrieving or providing access to information, designing, implementing or converting systems[14] providing consulting services, and conducting feasibility studies. The transfer of dominion and control of computer hardware and software for a consideration does not come within the purview of this section, since such transfer shall constitute a lease or rental of tangible personal property and be subject to tax under Section 12-426-25."[15]

---

provisions of this chapter and may adopt and enforce regulations relating to the administration and enforcement of this chapter. The commissioner may prescribe the extent to which any ruling or regulation shall be applied without retroactive effect." By its language, § 12-426 (1) specifically permits the commissioner to promulgate regulations regarding the enforcement of chapter 219 of the General Statutes, of which §§ 12-407 and 12-408 are a part.

[14] We presume, as did the parties in their briefs on appeal and the commissioner during oral argument before this court, that a comma was intended to appear after the term "systems" in § 12-426-27 (b) (1).

[15] We note that Andersen does not claim that the regulation is invalid or is an abuse of the commissioner's statutory power to promulgate regulations designed to carry out the purpose of the tax statutes. See *Katz* v. *Commissioner of Revenue Services*, 234 Conn. 614, 621–22, 662 A.2d 762 (1995). It is well established that "an administrative agency's regulations are presumed valid and, unless they are shown to be inconsistent with the authorizing statute, they have the force and effect of a statute. *Travelers Ins. Co.* v. *Kulla*, 216 Conn. 390, 399, 579 A.2d 525 (1990)." (Internal quotation marks omitted.) *Mass* v. *United States Fidelity & Guaranty Co.*, 222 Conn. 631, 649, 610 A.2d 1185 (1992). "This presumption is further underscored by the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq., which provides for legislative oversight through the legislative regulation review committee prior to approval of the regulations. General Statutes § 4-170." *General Accident Ins. Co.* v. *Wheeler*, 221 Conn. 206, 211, 603 A.2d 385 (1992).

The legislature recently amended General Statutes (Rev. to 1999) § 12-407 (2) by P.A. 00-174, § 71. Section 71 of P.A. 00-174 provides in relevant part: "Subsection (2) of section 12-407 of the general statutes, as amended by section 10 of public act 99-173, section 10 of public act 99-285 and section 1 of this act, is repealed and the following is substituted in lieu thereof: (2) 'Sale' and 'selling' mean and include . . . (i) the rendering of certain services for a consideration, exclusive of such services rendered by an employee for his employer, as follows: (A) *Computer and data processing services, including but not limited to, time, programming, code writing, modification of existing programs, feasibility studies and installation and implementation of software programs and systems even where such services are rendered in connection with the development, creation or production of canned or custom software or the license of custom software,* and exclusive of services rendered in connection with the creation, development hosting or maintenance of all or part of a web site which is part of the graphical, hypertext portion of the Internet, commonly referred to as the World-Wide Web . . . ." (Emphasis added.)

As stated previously, whether P.A. 00-174, § 71, should be given retroactive or prospective effect depends on the legislature's intent in enacting the statute. The language of P.A. 00-174, § 74, provides a strong indication that the legislature intended § 71 of the act to clarify § 12-407 (2), and therefore necessarily to apply retrospectively. Section 74 of P.A. 00-174 provides: "The intent of subsections (2), (13), (31) and (32) of section 12-407 of the general statutes, as amended by sections 71 to 73, inclusive, of this act is *to clarify that current law* subjects the sale of canned software to sales and use taxes as a sale of tangible personal property and *subjects the sale of computer and data processing services, as defined in said sections, to sales and use*

*taxes as a sale of services constituting a sale in accor-dance with subsection (2) of section 12-407 of the general statutes, as amended by this act."* (Emphasis added.) The second clause of § 74 of P.A. 00-174 makes clear that the intent of the amended § 12-407 (2) is to clarify that current law subjects the sale of computer and data processing services, "as defined in said sections," namely, § 12-407 (2) as amended, to sales and use taxes.

The legislative history also contains compelling indicia that the legislature intended to clarify, rather than to change, the universe of computer services that are subject to the sales tax. We note in particular that the *only* statements made in the legislative history of P.A. 00-174 with respect to computer and data processing services are those that emphasize its clarifying nature. In explaining Substitute Senate Bill No. 525, the bill eventually enacted as P.A. 00-174, Senator Martin M. Looney stated: "[T]here is a section of the bill that *clarifies* the definition of . . . computer [and] data processing services . . . ." (Emphasis added.) 43 S. Proc., Pt. 8, 2000 Sess., p. 2561. Senator William H. Nickerson also stated: "This [bill] has been carefully reviewed by caucus leaders, [the office of policy and management] and myself and [I] concur in Senator Looney's comments that by and large it is a *technical* implementation of necessary changes to the tax laws with *no major substantive problems. No major substantive initiatives in it."* (Emphasis added.) Id., p. 2563. During the legislative debate in the House of Representatives, Representative Richard O. Belden stated: "We *clarify* the definition of . . . computer [and] data processing services." (Emphasis added.) 43 H.R. Proc., Pt. 19, 2000 Sess., p. 6187.

We conclude, on the basis of our analysis of the relevant statutory provisions and the legislative history, that P.A. 00-174, § 71, was intended to clarify the mean-

ing of § 12-407 (2), namely, that the term computer services encompasses, among other things, the development, creation and production of software. In light of our conclusion that P.A. 00-174, § 71, was intended to clarify, rather than to change, existing law, we do not reach the second question in retroactivity analysis, namely, whether, under the circumstance where the legislature intended a *change* to existing law, it intended the change to have retroactive effect. See *State* v. *Magnano*, supra, 204 Conn. 284; see also *Circle Lanes of Fairfield, Inc.* v. *Fay*, supra, 195 Conn. 540–41. "Where an amendment is intended to clarify the original intent of an earlier statute, it necessarily has retroactive effect."[16] *State* v. *Magnano*, supra, 284.

We must therefore determine whether the services at issue in the present case fall within the enumerated class of computer and data processing services. We conclude that the definition of computer and data processing services encompasses the rendered services at issue in this case. Section 12-407 (2), as amended by P.A. 00-174, § 71, makes clear that the term "[c]omputer and data processing services" includes, but is not limited to "time, programming, code writing, modification of existing programs, feasibility studies and installation and implementation of software programs and systems even where such services are rendered in connection with the development, creation or production of canned or custom software or the license of custom software . . . ." In the present case, the trial court found that "the 'true object' of the contracts entered into with

---

[16] "The necessarily retroactive effect of clarifying legislation is not to be confused with the retroactive effect of legislation that changes the law. The former clarifies the substantive provisions to which a person has always been subject. The latter applies substantive provisions to a person heretofore not subject to those provisions. A claim that a clarifying amendment has created new substantive liability, therefore, is inapposite. See *State* v. *Blasko*, 202 Conn. 541, 559–60, 522 A.2d 753 (1987)." *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 44, 699 A.2d 101 (1997).

Andersen by [the gas company] and [the electric company] was to provide computer software programs that would meet their business needs. Andersen did not undertake to provide [the gas company] and [the electric company] with services that would meet their objective, but rather developed software programs which in and of themselves would provide [the gas company] and [the electric company] with the informational systems to allow them to operate efficiently and cost-effectively now and into the immediate future." The trial court further stated that "the object of the underlying transaction in this case was the creation of informational systems for both [the gas company] and [the electric company], not the creation of the various elements necessary to reach the final product." These findings bring the services rendered by Andersen within the clarified, expansive definition of "computer and data processing services."

Andersen argues that P.A. 00-174, § 71, does not apply to the present case because this case does not involve an "open tax [period]."[17] Specifically, Andersen argues that its refund claim does not involve an open tax period because it involves the years 1991 through 1993, and the statute of limitations, with respect to the making of a refund claim by a taxpayer or the issuance of an assessment by the commissioner, generally is three years, unless that period is extended. See General Statutes (Rev. to 1999) § 12-425 (1), as amended by Public Acts 1999, No. 99-48, § 9;[18] General Statutes (Rev. to

---

[17] Section 83 of P.A. 00-174 provides in relevant part that "sections 68 to 74, inclusive, shall apply to all open tax periods . . . ."

[18] General Statutes (Rev. to 1999) § 12-425 (1), as amended by Public Acts 1999, No. 99-48, § 9, provides: "No refund shall be allowed unless a claim therefor is filed with the commissioner within three years from the last day of the month succeeding the period for which the overpayment was made, or, with respect to assessments made under sections 12-415, as amended by this act, and 12-416, as amended by this act, within six months after the assessments become final. No credit shall be allowed after the expiration of the period specified for filing claims for refund unless a claim for credit is filed with the commissioner within such period, or unless the credit relates

1999) § 12-415 (f) and (g), as amended by Public Acts 1999, No. 99-48, § 6.[19] We disagree. Rather, we agree with the commissioner that open tax period includes any tax period for which the tax liability in question is still in controversy.

As previously explained, the relevant statutory language and legislative history demonstrate that the legislature intended § 71 of P.A. 00-174 to be clarifying legislation. Although the term "open tax period" has been neither defined in the General Statutes nor construed by this court, it would be contrary to common sense to construe open tax period in such a manner as to exclude situations in which tax liability for a certain tax period is still in controversy. Such a construction would necessarily result in the bizarre conclusion that

to a period for which a waiver is given pursuant to subsection (g) of section 12-415, as amended by this act."

[19] General Statutes (Rev. to 1999) § 12-415 (f) and (g), as amended by Public Acts 1999, No. 99-48, § 6, provide in relevant part: "(f) Except in the case of fraud, intent to evade this chapter or authorized regulations, failure to make a return, or claim for additional amount pursuant to subsection (3) of section 12-418, every notice of a deficiency assessment shall be mailed within three years after the last day of the month following the period for which the amount is proposed to be assessed or within three years after the return is filed, whichever period expires later. The limitation specified in this subsection does not apply in case of a sales tax proposed to be assessed with respect to sales of services or property for the storage, acceptance, consumption or other use of which notice of a deficiency assessment has been or is given pursuant to subsection (e) of this section, subsection (c) of section 12-416, as amended by this act, subsection (2) of section 12-417 and this subsection. The limitation specified in this subsection does not apply in case of an amount of use tax proposed to be assessed with respect to storage, acceptance, consumption or other use of services or property for the sale of which notice of a deficiency assessment has been or is given pursuant to said subsections and this subsection.

"(g) If, before the expiration of the time prescribed in subsection (f) of this section for the mailing of a notice of deficiency determination, the taxpayer has consented in writing to the mailing of the notice after such time, the notice may be mailed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon."

the *clarifying* legislation in this case, which by its language applies to "all open tax periods," is inapplicable to a tax period for which tax liability is still in controversy.

Andersen also argues that the legislature's statement of intent, articulated in § 74 of P.A. 00-174, is clear only as to the taxation of canned software. In this connection, Andersen argues that, with respect to the second clause of § 74, the legislature simply made a circular statement, namely, that computer and data processing services are taxable as computer and data processing services. This argument, however, ignores the careful analysis of the statutory language and legislative history articulated previously.

Andersen further contends that: (1) if the legislature had intended to overrule the trial court decision in the present case, it simply could have stated that the services used to create custom software are taxable as computer and data processing services *regardless of the true object of the taxpayer*; and (2) the legislature left intact the so-called true object test. Our conclusion, however, that P.A. 00-174, § 71, subjects the services used to create custom software to sales and use taxes, is not inconsistent with our prior applications of the true object test. We have never applied the true object test, a judge-made rule, so as to exclude from the purview of a statute or regulation a service that, upon applying proper principles of statutory and regulatory construction and absent a finding that the service was merely incidental to the transaction, would otherwise fall under the relevant statute or regulation. Instead, we have applied the so-called true object test in generally two contexts: (1) where what would otherwise bring the transaction under the purview of the relevant taxing statute is merely incidental to the objective of the transaction; see, e.g., *Hartford Parkview Associates Ltd. Partnership* v. *Groppo*, supra, 211 Conn. 252–53;

*Dine Out Tonight Club* v. *Dept. of Revenue Services*, 210 Conn. 567, 572, 556 A.2d 580 (1989); *International Business Machines Corp.* v. *Brown*, 167 Conn. 123, 132, 355 A.2d 236 (1974); and (2) where the applicability of the sales tax depends on the purpose of the sale, which is necessarily a question of intent. See, e.g., *American Totalisator Co.* v. *Dubno*, 210 Conn. 401, 406, 555 A.2d 414 (1989); *United Aircraft Corp.* v. *Connelly*, 145 Conn. 176, 185, 140 A.2d 486 (1958); *United Aircraft Corp.* v. *O'Connor*, 141 Conn. 530, 537–38, 107 A.2d 398 (1954).

Andersen also relies on *Hartford Parkview Associates Ltd. Partnership* v. *Groppo*, supra, 211 Conn. 248, in which we concluded that a hotel's purchase of reservation services was not subject to the sales tax as "computer and data processing services" pursuant to § 12-407 (2) (i) (A). In *Hartford Parkview Associates Ltd. Partnership*, the trial court had found that " '[t]he essence of [the reservations] services is obtaining and informing the [t]axpayer of reservations [that the service] has made for the [h]otel.' " Id., 249. The trial court had concluded that, "[b]ecause the use of a computer to communicate this information was merely incidental to this objective," those services were not taxable as computer and data processing services. Id., 252–53. Accordingly, we affirmed the trial court's conclusion, reasoning that a contrary conclusion would impose tax liability on any computer use under the guise of computer services. Id., 251–53. That conclusion does not compel a contrary conclusion in the present case.

Andersen, as did the trial court, also improperly relies on *Northeast Datacom, Inc.* v. *Wallingford*, supra, 212 Conn. 639, and misapplies the principles represented therein. Instead, we conclude that the holding in *Northeast Datacom, Inc.*, is not so broad as to apply to the issue in the present case. In *Northeast Datacom, Inc.*, software owned by the named plaintiff, which included canned software that it had purchased, software custo-

mized by outside contractors, and custom software that it had developed, had been assessed as tangible personal property for municipal taxation purposes. Id., 641–42. We concluded that the "physical devices are only the most tangential incidents of a computer program and the fact that tangible property is used to store or transmit the software's binary instructions does not change the character of what is fundamentally a classic form of intellectual property." Id., 644. We further concluded that the taxation of the software at issue, which was primarily custom software, as tangible personal property was improper because it impermissibly linked the incidents of the intellectual, intangible component of the software, namely, "the right to produce and sell more copies, the right to change the underlying work, the right to license its use to others and the right to transfer the copyright itself," to "the tangible medium in which the software is stored and transmitted." Id., 646. Simply put, what is at issue in the present case, namely, whether the services provided to develop, create or produce software are taxable as computer services, was not at issue in *Northeast Datacom, Inc.*

## II

Finally, we conclude that a new trial, as opposed to a reversal and directed judgment for the commissioner, is necessary. In the initial phase of Andersen's appeal to the Superior Court, the trial court was asked jointly by the parties to bifurcate the appeal into two hearings. The purpose of the first hearing was to address whether the payments made to Andersen were: (1) fully nontaxable as a license or purchase of intangible custom software; (2) fully taxable as computer and data processing services; or (3) a combination of nontaxable and taxable components. The parties further requested, and the trial court agreed, that if the court found that the payments involved both nontaxable and taxable components, a further proceeding be held to consider the proper allo-

cation of fees charged by Andersen to the gas company and the electric company between the nontaxable and taxable components. Accordingly, the parties did not present evidence as to the allocation issue. Therefore, in view of our conclusion that computer and data processing services encompasses the development, creation or production of software, the parties shall have an opportunity to present evidence as to the proper allocation, if any, of fees charged by Andersen between the transfer of intangible rights and the services involved in developing, creating or producing the software.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.