ROBINSON, J.
**283 The principal issue in this case is the extent to which General Statutes § 12-256 (b) (2)[1] imposes a tax on gross earnings from a satellite television operator's business operations in this state, which include the transmission of video programming, the sale and lease of equipment required to view that programming, the installation and maintenance of such equipment, digital video recording (DVR) service, and payment related fees. The defendant, the Commissioner of Revenue Services (commissioner), appeals, and the plaintiff, Dish Network, LLC, cross appeals, from the judgment of the trial court sustaining in part the plaintiff's tax appeals and ordering a refund of taxes previously paid on earnings from the sale of certain goods **284 and services.[2] Addressing the parties' *541 various contentions, we reach the following conclusions: (1) the trial court properly determined that General Statutes § 12-268i[3] does not provide the exclusive procedure for challenging a tax assessment for a tax period that has been the subject of an audit, and, therefore, the plaintiff was not barred from seeking a refund for certain audited tax periods pursuant to General Statutes § 12-268c (a) (1) ;[4] (2) § 12-256 (b) (2) imposes a tax on gross earnings from the transmission of video programming by satellite and certain payment related fees, but not the sale, lease, installation, or maintenance of equipment or DVR service; and (3) the trial court properly determined that **285 the plaintiff was not entitled to interest on the refund pursuant to § 12-268c (b) (1).[5] Accordingly, we reverse in part the judgments of the trial court.
The record reveals the following procedural history and facts that were found by the trial court or that are not disputed. The plaintiff, a limited liability company with its principal place of business in Colorado, is in the business of providing satellite delivered digital television to subscribers across the country, including in Connecticut. In order to provide this service, the plaintiff transmits video programming from its facilities to one or more satellites orbiting the Earth. The satellites then transmit the programming to an antenna, known as a satellite dish, which is connected to a receiver at the subscriber's location.[6]
In order to receive a particular package of video programming, individual subscribers must enter into a contract with the plaintiff. In addition to charging a fee for the transmission of video programming, these contracts allow the plaintiff to charge subscribers for the purchase or lease of satellite dishes and related equipment, equipment installation and maintenance, DVR service, and subscriptions to *542 Dish Magazine, which is delivered by the United States Postal Service. The contracts also allow the plaintiff to impose fees for the failure of a subscriber to pay bills on time, for reconnecting the subscriber after being disconnected **286 for nonpayment, and for certain types of payment plans (payment related fees).[7]
Under § 12-256 (b), the plaintiff is required to "pay a quarterly tax upon the gross earnings from .... (2) the transmission to subscribers in this state of video programming by satellite ...." Pursuant to this provision, the plaintiff filed timely tax returns for the first, second, third, and fourth quarters of 2006, the first quarter of 2007, the third and fourth quarters of 2010, and the first quarter of 2011 (disputed tax periods).[8] In July 2008, the commissioner conducted a field audit of the plaintiff's returns for the first, second, and third quarters of 2006 (audited tax periods) pursuant to General Statutes § 12-268g[9] and sent a notice of the result to the plaintiff. The commissioner also sent the plaintiff a billing notice for the audited tax periods. The plaintiff never challenged the audit results.
The plaintiff ultimately filed amended tax returns and sought refunds pursuant to § 12-268c (a) (1) for all of the disputed tax periods, including the audited tax periods. The plaintiff claimed that it had paid taxes on gross earnings from the sale of both programming services and nonprogramming goods and services during the relevant periods when, according to the plaintiff, the only earnings subject to taxation under § 12-256 (b) (2) were its gross earnings from the sale of programming **287 services. The commissioner concluded that, to the contrary, the plaintiff's gross earnings from the sale of both programming services and nonprogramming goods and services were subject to taxation under § 12-256 (b) (2). Accordingly, the commissioner denied the plaintiff's requests for refunds.
The plaintiff appealed to the trial court from the commissioner's decisions pursuant to General Statutes § 12-268l .[10] Thereafter, the plaintiff filed a motion for summary judgment, contending that it was entitled, as a matter of law, to a refund of the taxes that it paid pursuant to § 12-256 (b) (2) on gross earnings from the sale of nonprogramming goods and services. The *543 commissioner then filed a motion seeking partial summary judgment, contending that, to the contrary, the plaintiff's gross earnings from the sale of nonprogramming goods and services were, as a matter of law, subject to taxation under § 12-256 (b) (2).[11] The commissioner further claimed that the plaintiff's appeal with respect to the audited tax periods was barred because the amounts owed for those periods had been finally determined pursuant to the audit, the plaintiff had failed to exhaust its administrative remedies by challenging **288 the audit result pursuant to § 12-268i, and the statute authorizing refund claims, § 12-268c, did not provide an alternative route for the plaintiff to contest the final assessment for the audited tax periods.
With respect to the commissioner's claim that the plaintiff was barred from seeking a refund for the audited tax periods because it failed to challenge the audit result pursuant to § 12-268i, the trial court concluded that that statute does not provide the exclusive administrative remedy for the overpayment of taxes for a tax period that has been subject to an audit. Rather, the court concluded that " §§ 12-268c and 12-268i stand independently," and that § 12-268c provides an alternative procedure for correcting an overpayment of taxes under these circumstances. Accordingly, the court concluded that the plaintiff's claim with respect to the audited tax periods was not barred.
The court then turned to the plaintiff's claim that it was entitled to a refund of taxes paid on gross earnings from the sale of nonprogramming goods and services. The court noted that § 12-256 (b) required the plaintiff to pay taxes "upon the gross earnings from ... the transmission to subscribers in this state of video programming by satellite ...." The court then observed that dictionaries have defined " 'from' as indicating 'the source or original or moving force of something.' " The court further noted that the language of § 12-256 (b) (2) stands in contrast to the language of § 12-256 (b) (1), which expressly imposes a tax on the gross earnings from "the lines, facilities, apparatus and auxiliary equipment in this state used for operating a community antenna television system ...."[12] Applying the principles **289 that related parts of a statute provide guidance in determining the meaning of a statutory provision; see State v. Ehlers , 252 Conn. 579, 590, 750 A.2d 1079 (2000) ("[r]elated statutory provisions, or statutes in pari materia, often provide guidance in determining the meaning [of statutory language]" [internal quotation marks omitted] ); and that tax statutes must be strictly construed; see Zachs v. Groppo , 207 Conn. 683, 689, 542 A.2d 1145 (1988) ; the trial court concluded that the plaintiff's gross earnings from the sale of equipment, installation and maintenance of equipment, and subscriptions to Dish Magazine are not gross earnings "from ... the transmission ... of video programming by satellite" and that, therefore, the plaintiff was entitled to a refund of the taxes that it had paid on those gross earnings. The court also concluded, however, that payment related fees and DVR service are sufficiently related to "the *544 source," i.e., "transmission to subscribers in this state of video programming by satellite"; General Statutes § 12-256 (b) (2) ; that they constituted programming services subject to taxation.
The trial court then noted that the parties had not yet addressed the amount of the refund that was due to the plaintiff. Accordingly, the court ordered the parties to confer on that issue and to report back to the court. Thereafter, the parties submitted a joint stipulation to the court setting forth the amounts due to the plaintiff. On the basis of the stipulation, the trial court rendered judgment in favor of the plaintiff in the amount of $886,845.
The plaintiff then filed a motion requesting that the trial court award interest on the $886,845 refund pursuant to § 12-268c (b) (1). The trial court concluded that § 12-268c (b) (1) applies "only to the situation where the commissioner ... allows for a refund due to overpayment. The correct statute referring to interest after a successful tax appeal from a gross earning tax payment **290 is § 12-268l ." The court denied the plaintiff's motion because an interest award pursuant to § 12-268l is "primarily an equitable determination and a matter lying within the discretion of the trial court"; (internal quotation marks omitted) Wheelabrator Bridgeport, L.P. v. Bridgeport , 320 Conn. 332, 371, 133 A.3d 402 (2016) ; and the plaintiff had presented no evidence that the equities weighed in favor of granting an interest award. In addition, the court concluded that the plaintiff was not entitled to interest because it had voluntarily agreed to the stipulation of damages, which did not include interest on the refund.
The commissioner then filed an appeal, claiming that the trial court improperly determined that (1) the plaintiff's claim for a refund with respect to the audited tax periods was not barred, and (2) the plaintiff's gross earnings on the sale of nonprogramming goods and services were not subject to taxation under § 12-256 (b) (2). The plaintiff then cross appealed, claiming that (1) the trial court improperly determined that payment related fees and gross earnings from the provision of DVR service are subject to taxation pursuant to § 12-256 (b) (2), and (2) the plaintiff was not entitled to interest on the refund pursuant to § 12-268c (b) (1). See footnote 2 of this opinion. We agree with the plaintiff that the trial court improperly determined that gross earnings from the provision of DVR service are subject to taxation under § 12-256 (b) (2), and we reject the parties' other claims.
I
We first address the commissioner's claim that the trial court improperly determined that § 12-268i does not provide the exclusive procedure for challenging the assessment after an audit and, therefore, that the **291 plaintiff was not barred from seeking a refund for the audited tax periods pursuant to § 12-268c.[13] We disagree.
Whether § 12-268i provides the exclusive procedure for seeking a refund of *545 an overpayment when the commissioner has previously conducted an audit for the tax period in question presents a question of statutory interpretation subject to plenary review. See, e.g., Perez-Dickson v. Bridgeport , 304 Conn. 483, 507, 43 A.3d 69 (2012). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature.... In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply.... In seeking to determine that meaning [General Statutes] § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) Id., at 507-508, 43 A.3d 69.
We begin with a review of the statutory language. Section 12-268g provides in relevant part that "[t]he commissioner shall, within three years after the due date for the filing of a return ... examine it and, in case any error is disclosed by such examination, shall, **292 within thirty days after such disclosure, notify the taxpayer thereof...." Section § 12-268i provides in relevant part that "[a]ny taxpayer aggrieved by the action of the commissioner or his authorized agent in fixing the amount of any tax ... may apply to the commissioner, in writing, within sixty days after the notice of such action is delivered or mailed to it, for a hearing and a correction of the amount of such tax ...." Section 12-268c (a) (1) provides in relevant part that "[a]ny company ... believing that it has overpaid any taxes due under the provisions of chapter 210, 211 or 212 may file a claim for refund in writing with the commissioner within three years from the due date for which such overpayment was made ...."
The commissioner claims that, when the commissioner has audited a tax return for a specific tax period pursuant to § 12-268g and notified the taxpayer of errors that were discovered, and the taxpayer has failed to challenge the audit result within sixty days pursuant to § 12-268i, the taxpayer is then barred from requesting a refund for any overpayment of taxes during the audited period pursuant to § 12-268c (a) (1). The commissioner contends that allowing a taxpayer to file a refund claim pursuant to § 12-268c (a) (1) in these circumstances-under which a refund claim may be filed "within three years from the due date for which such overpayment was made"-would "[eliminate] the finality of audit determinations" and render meaningless the sixty day time limitation contained in § 12-268i. Thus, under the commissioner's interpretation of the statutory scheme, if the commissioner discovers an error in a tax return during an audit conducted pursuant to § 12-268g, and the taxpayer does not dispute that specific error, the taxpayer must then either (1) conduct its own comprehensive audit to ensure that there was no overpayment of taxes during the audited period for any reason and, if it discovers an overpayment, challenge the audit **293 result and assessment within sixty days, or (2) be forever foreclosed from seeking a refund of the overpayment.
Nothing in the language of § 12-268g, however, suggests that there is any such burden on the taxpayer. To the contrary, the statute provides that the commissioner shall examine the taxpayer's tax return. See General Statutes § 12-268g ("[t]he commissioner shall, within three years after the due date for the filing of a return ... examine it"). In turn, this suggests *546 that, if the commissioner finds an error, the taxpayer has sixty days under § 12-268i to challenge that specific finding of error by filing what is the effective equivalent of an appeal from the audit result, and that the taxpayer is not required to identify at that time any and all overpayments made during the audited period, regardless of whether they are related in any manner to the error found by the commissioner. Indeed, an appeal from an administrative ruling ordinarily does not provide the appellant with the opportunity-much less impose the obligation-to raise claims that are entirely unrelated to the ruling being appealed from. Accordingly, it is reasonable to conclude that overpayments made during the audited period that are discovered by the taxpayer are governed by § 12-268c, which authorizes taxpayers to seek a refund by filing a claim with the commissioner within three years of the due date for the overpayment. See General Statutes § 12-268c (a) (1) ("[a]ny company ... believing that it has overpaid any taxes ... may file a claim for refund in writing with the commissioner within three years from the due date for which such overpayment was made").
The commissioner's interpretation of the relevant statutes is also unworkable because, as the plaintiff in the present case points out, there are circumstances under which a taxpayer may not even have a claim for a refund until long after the audit result has become **294 final. For example, a taxpayer that provided a refund to a customer for a payment received during the audit period after the sixty day period for challenging an audit result had expired, but before the three year period for seeking a refund pursuant to § 12-268c had expired, would be left without effective recourse. The commissioner asserted at oral argument before this court that a taxpayer may seek relief pursuant to General Statutes § 12-39s[14] under these circumstances, but that statute provides far less protection to taxpayers who have overpaid their taxes than § 12-268c does because refund claims pursuant § 12-39s, unlike claims pursuant to § 12-268c, "are committed to the [commissioner's] sole discretion, and [the courts are], therefore, without jurisdiction to evaluate [their] merits ...." Chatterjee v. Commissioner of Revenue Services , 277 Conn. 681, 693, 894 A.2d 919 (2006). Accordingly, we cannot conclude that the legislature intended that § 12-39s would apply to refund claims that, for reasons entirely beyond the control of the taxpayer, could not be discovered within sixty days of an audit result, but that are discovered within three years of the overpayment.
We conclude, therefore, that the trial court properly determined that the fact that an audit result has become final because the taxpayer has failed to challenge it within sixty days pursuant to § 12-268i does not necessarily mean that the taxpayer is barred from seeking a refund of overpayments made during the audited period pursuant to § 12-268c. We emphasize that we are not holding that a taxpayer may relitigate a specific audit result that has become final by requesting a refund of **295 payments that were made on the basis of the specific error that the commissioner found. Principles of res judicata or collateral estoppel, as well as the policy disfavoring *547 collateral attacks on final decisions, would likely bar any such claim. See Weiss v. Weiss , 297 Conn. 446, 459, 998 A.2d 766 (2010) ("[r]es judicata prevents a litigant from reasserting a claim that has already been decided on the merits" [internal quotation marks omitted] ); Convalescent Center of Bloomfield, Inc. v. Dept. of Income Maintenance , 208 Conn. 187, 200-201, 544 A.2d 604 (1988) ("[u]nless a litigant can show an absence of subject matter jurisdiction that makes the prior judgment of a tribunal entirely invalid, he or she must resort to direct proceedings to correct perceived wrongs in the tribunal's conclusive decision"); Doyle v. Universal Underwriters Ins. Co. , 179 Conn. App. 9, 14, 178 A.3d 445 (2017) ("[c]ollateral estoppel precludes a party from relitigating issues and facts actually and necessarily determined in an earlier proceeding between the same parties" [internal quotation marks omitted] ); see also Lafayette v. General Dynamics Corp. , 255 Conn. 762, 773, 770 A.2d 1 (2001) ("[a]s a general proposition, the governing principle is that administrative adjudications have a preclusive effect when the parties have had an adequate opportunity to litigate" [internal quotation marks omitted] ). We do conclude, however, that the fact that the commissioner has conducted an audit does not mean that a taxpayer must either make a claim within sixty days for any and all overpayments made during the audited period, regardless of whether the overpayments are related to the audit result or are discoverable at the time, or be forever barred from seeking a refund of those overpayments. In the present case, the commissioner does not argue that the claims that the plaintiff raised in its requests for a refund pursuant to § 12-268c were related in any way to errors that the commissioner discovered **296 during the audits. Accordingly, we conclude that the trial court properly determined that the plaintiff's claim for a refund for the audited periods is not barred.
II
We next address the parties' claims with respect to the scope of the plaintiff's earnings that are subject to taxation under § 12-256 (b) (2). The commissioner claims on appeal that the trial court improperly determined § 12-256 (b) (2) does not subject the plaintiff's gross earnings from the sale and lease of equipment or from equipment installation and maintenance to taxation. The plaintiff claims in its cross appeal that the trial court improperly determined that earnings from the sale of DVR service and payment related fees are subject to taxation under § 12-256 (b) (2).[15] We reject the commissioner's claim on appeal. We also reject the plaintiff's claim that the trial court improperly determined that payment related fees are subject to taxation. We agree with the plaintiff, however, that gross earnings from the sale of DVR service are not subject to taxation.
Whether gross earnings from the plaintiff's various business operations are subject to taxation under § 12-256 (b) (2) presents a question of statutory interpretation over which our review is plenary.[16] See, e.g., *548 Perez-Dickson v. Bridgeport , supra, 304 Conn. at 507, 43 A.3d 69. "[W]hen the issue is the imposition of a tax, rather than a claimed right to an exemption or a deduction, the governing **297 authorities must be strictly construed against the commissioner and in favor of the taxpayer." (Internal quotation marks omitted.) Andersen Consulting, LLP v. Gavin , 255 Conn. 498, 511, 767 A.2d 692 (2001) ; see also Zachs v. Groppo , supra, 207 Conn. at 689, 542 A.2d 1145 ("taxing statutes are to be strictly construed ... and statutory ambiguities in the imposition of such taxes must be resolved in favor of the taxpayer and against the taxing authority" [citations omitted] ).
We begin our analysis with the language of § 12-256 (b). That statute provides in relevant part that "each person operating a business that provides one-way transmission to subscribers of video programming by satellite, shall pay a quarterly tax upon the gross earnings from ... (2) the transmission to subscribers in this state of video programming by satellite .... No deduction shall be allowed from such gross earnings for operations related to commissions, rebates or other payments, except such refunds as arise from errors or overcharges. On or before the last day of the month next succeeding each quarterly period, each such person shall render to the commissioner a return on forms prescribed or furnished by the commissioner, signed by the person performing the duties of treasurer or an authorized agent or officer of the system or service operated by such person, which return shall include information regarding the name and location within this state of such system or service and the total amount of gross earnings derived from such operations and such other facts as the commissioner may require for the purpose of making any computation required by this chapter." General Statutes § 12-256 (b).
A
We first address the commissioner's contention that the phrase "business that provides one-way transmission to subscribers of video programming by satellite"
**298 was intended to distinguish the satellite television business from other types of businesses, and that the tax upon gross earnings was intended to be on gross earnings from that business , including gross earnings from the sale or lease of equipment required to view video programming and equipment installation and maintenance. The plaintiff contends, to the contrary, that § 12-256 (b) plainly and unambiguously imposes a tax only on the gross earnings from "the transmission to subscribers in this state of video programming by satellite"-i.e., programming services. The plaintiff further contends that, to the extent that there is any ambiguity in the statute, that ambiguity must be resolved in its favor because a statute imposing a tax must be strictly construed.
Although we are not entirely sure that the phrase "the transmission to subscribers in this state of video programming by satellite" plainly and unambiguously is limited to programming services, we also cannot conclude that, on its face, the phrase plainly and unambiguously includes such operations as the sale or lease of satellite dishes and related equipment or equipment installation and maintenance. Cf. Texaco Refining & Marketing Co. v. Commissioner of Revenue Services , 202 Conn. 583, 592-93, 522 A.2d 771 (1987) ("[w]hat the legislature intended by defining 'gross earnings' as 'earnings from the sale of petroleum products' can hardly be deemed to be plain and unambiguous on its face"). We therefore examine the other provisions of § 12-256 and related statutes to determine whether they clarify the meaning of the phrase. See, e.g., *549 Perez-Dickson v. Bridgeport , supra, 304 Conn. at 508, 43 A.3d 69 (" § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes" to determine whether statutory language is ambiguous when considered in context [internal quotation marks omitted] ). **299 We first consider the commissioner's claim that the language of § 12-256 (b) (2) imposing a tax on "gross earnings" establishes that earnings from the sale, lease, installation, and maintenance of equipment are subject to taxation because this court has consistently held that a business' "gross earnings include a taxpayer's entire earnings and receipts." (Internal quotation marks omitted.) Texaco Refining & Marketing Co. v. Commissioner of Revenue Services , supra, 202 Conn. at 597, 522 A.2d 771. We conclude that the commissioner's reliance on Texaco Refining & Marketing Co. is misplaced. The plaintiff in that case contended that moneys that it collected from customers to pay for the tax imposed by General Statutes (Rev. to 1985) § 12-587 on "gross earnings ... derived ... from the sale of petroleum products in this state" were not taxable "gross earnings." Id., at 584 n.3, 522 A.2d 771. This court summarily rejected the plaintiff's claim, made "in passing," that these moneys plainly were not "earnings from the sale of petroleum products" for purposes of § 12-587. Id., at 592, 522 A.2d 771. The court then concluded that the only issue that it was required to address was the meaning of the phrase "gross earnings," as used in § 12-587. See id., at 593, 522 A.2d 771 ("[t]he heart of the disagreement between the parties is how to define the relevant 'earnings' "); id., at 594, 522 A.2d 771 ("the statutory definition of 'gross earnings' in § 12-587 instructs us to look to the usual meaning of 'gross receipts' "). Thus, Texaco Refining & Marketing Co. stands only for the proposition that "gross earnings" include the business' "entire earnings and receipts" from an operation of the business that is subject to the tax . (Internal quotation marks omitted.) Id., at 597, 522 A.2d 771. Contrary to the commissioner's contention, this court did not hold that a gross earnings tax necessarily applies to all operations in which the taxed business is engaged.
The commissioner also makes a number of textual arguments in support of the contention that § 12-256 (b) (2) imposes a tax on all nonprogramming services.
**300 First, he contends that the second sentence of § 12-256 (b) providing that "[n]o deduction shall be allowed from such gross earnings for operations related to commissions, rebates or other payments, except such refunds as arise from errors or overcharges," clearly means that the tax is imposed on "gross earnings for operations." We disagree. Although the sentence is not a model of clarity, it is more reasonably read as providing that "[n]o deduction shall be allowed ... for operations related to commissions ...." General Statutes § 12-256 (b). In other words, contrary to the commissioner's contention, the phrase "for operations" does not modify "gross earnings"; rather, the phrase "related to commissions" modifies "operations." Indeed, the phrase "gross earnings for operations" makes little sense. (Emphasis added.) General Statutes § 12-256 (b). In ordinary usage, earnings derive from a business' operations, not for them. In contrast, the phrase "[n]o deduction shall be allowed ... for operations" is grammatically sound. In any event, even if the legislature intended the phrase "gross earnings for operations" to refer to "gross earnings from operations," we cannot perceive why, as applied to satellite television providers, the word "operations" should be interpreted to mean anything other than "the transmission to subscribers in this *550 state of video programming by satellite ...." General Statutes § 12-256 (b) (2).
Second, the commissioner relies on the third sentence of § 12-256 (b) providing that "[o]n or before the last day of the month next succeeding each quarterly period, each [taxpayer] shall render to the commissioner a return on forms prescribed or furnished by the commissioner, signed by the person performing the duties of treasurer or an authorized agent or officer of the system or service operated by such person, which return shall include information regarding the name and location within this state of such system or service **301 and the total amount of gross earnings derived from such operations and such other facts as the commissioner may require for the purpose of making any computation required by this chapter." (Emphasis added.) The commissioner contends that this language shows that the tax is imposed on gross earnings derived from all of the plaintiff's operations. The obvious flaw in this argument, however, is that the statute expressly refers to "such operations," and the antecedent to this phrase is "the transmission to subscribers in this state of video programming by satellite ...."[17] (Emphasis added.) General Statutes § 12-256 (b) (2). Accordingly, if the phrase "the transmission to subscribers in this state of video programming by satellite" does not include all of the plaintiff's operations-which is the very issue that we must decide-the phrase "such operations" does not include all of those operations.
The commissioner further contends that "construction of 'transmission of video programming by satellite' as referring to a separately itemized product, rather than a description of the [plaintiff's] business itself, leads to absurd or unworkable results," because the transmission of video programming itself is useless to subscribers if they do not have the equipment to receive and view the programming. Again, we are not persuaded. The mere fact that subscribers must purchase or lease equipment in order to view the video programming **302 transmitted by the plaintiff does not, ipso facto, establish that the legislature must have intended to impose a tax on earnings from the sale or lease of that equipment.
We also disagree with the commissioner's contention that the plaintiff sells no product that merely consists of the "transmission of video programming" because "[a] one-way video programming by satellite business ... is always transmitting all of its offered programming to its entire service area, whether or not any given person on any given plot of real estate has subscribed to its services." (Emphasis in original.) Because subscribers would discontinue payments to the plaintiff if it stopped transmitting video programming, it necessarily follows that they are paying for such transmissions. Indeed, we see no reason why a satellite television provider could not engage exclusively in the operation of transmitting video programming and leave to others the sale and installation *551 of equipment necessary to view the programing. In that case, the company's earnings could be from nothing except the sale of transmissions. We fail to see the significance of the fact that satellite television providers continue their transmissions regardless of the number of subscribers in a particular geographic area.
The commissioner further contends that, if § 12-256 (b) (2) applies only to programming services, satellite television providers hypothetically could avoid paying any tax at all by allocating all charges for transmission of video programming to charges for the sale or lease of equipment necessary to receive the transmissions. Nothing in the record, however, suggests that this hypothetical problem has actually materialized. To the contrary, the commissioner stipulated before the trial court that the plaintiff had accurately allocated earnings from programming services and nonprogramming goods and services when it calculated the amount of the refund **303 that it was owed for taxes paid on gross earnings from the sale of nonprogramming services, which allocation was based upon the plaintiff's internal accounting policies.[18]
Finally, the commissioner contends that, by using the word "from" in the phrase "gross earnings from ... (2) the transmission to subscribers in this state of video programming by satellite"; General Statutes § 12-256 (b) ; the legislature "delegated the task of determining the sufficiency of the relationship of the receipts to the business' operations to the commissioner." To support this contention, the commissioner relies on this court's decision in Scholastic Book Clubs, Inc. v. Commissioner of Revenue Services , 304 Conn. 204, 215, 38 A.3d 1183, cert. denied, 568 U.S. 940, 133 S.Ct. 425, 184 L.Ed.2d 255 (2012), in which we interpreted a statute, General Statutes § 12-407 (a) (15) (A), containing the phrase "includes but shall not be limited to." (Internal quotation marks omitted.) Id. We concluded that that phrase, "coupled with the enumeration of specific or illustrative acts of ... conduct, is indicative of a legislative intent ... to delegate to the [commissioner] the duty of ascertaining what other or additional acts fall within the articulated standard." (Internal quotation marks omitted.) Id. The basis for this conclusion, however, was that the phrase "includes but shall not be limited to" is expansive , that is, it indicates that the **304 statute refers to items in addition to the expressly enumerated items. Id. The commissioner has cited no authority for the proposition that the word "from," when coupled with a specified item, has a similarly expansive meaning. Accordingly, we cannot conclude the legislature's use of the word "from" in § 12-256 (b) is indicative of an intent that the commissioner would have the discretion to tax gross earnings from business operations in addition to the specifically enumerated operation, namely, "the transmission to subscribers in this state of video programming by satellite," or that that phrase should be construed broadly to include any potentially related operations. *552 We further note that businesses are not always taxed on the gross earnings from all of their business operations. See Hartford Electric Light Co. v. Sullivan , 161 Conn. 145, 155-56, 285 A.2d 352 (1971) (statute imposing tax on gross earnings of public electric utility did not include earnings from contributions in aid of construction, transmission receipts and transmission credits); see also General Statutes § 12-587 (b) (2) (exempting earnings from sale of enumerated petroleum products from tax on gross earnings of company engaged in refining or distribution of petroleum products). In addition, when the legislature wants to tax a business' earnings from all sources, it knows how to do so. For example, General Statutes § 12-249 provides that "[e]ach corporation operating a railroad, and carrying on business for profit in this state, shall ... pay a tax computed upon its gross earnings from all sources from operations in this state ...."[19] (Emphasis added.) We can perceive **305 no reason why the legislature would not have used similar language in § 12-256 (b) (2) if its intent had been to impose a tax on all operations of a business engaged in the transmission of video programming by satellite.
We acknowledge that the legislative history of Public Acts 2003, Spec. Sess., June, 2003, No. 03-1, § 92, which is codified at § 12-256 (b) (2), does not reveal the reasons why the legislature would have wanted to exempt from the imposition of the tax gross earnings from the sale and lease of equipment by satellite television providers, and from the installation and maintenance of such equipment. We cannot simply assume, however, that no such reasons could possibly have existed.[20] It is possible, for example, that the legislature might have believed that not imposing a tax on the sale or lease of equipment would incentivize the purchase of such equipment and thereby expand the gross earnings from transmissions that are subject to the tax.[21]
*553 It is also **307 possible that the legislature was unaware that satellite television providers derive significant earnings from the sale and lease of equipment necessary to view the video programming that they transmit.
We conclude, therefore, that nothing in the text of § 12-256 or related statutes makes it clear that the phrase "the transmission to subscribers in this state of video programming by satellite," as it is used in § 12-256 (b) (2), was intended to include the sale or lease of satellite dishes and related equipment required to view video programming transmitted by satellite or fees for equipment installation and maintenance. Accordingly, we conclude that the phrase is ambiguous in that respect. It is well settled that tax statutes must be strictly construed, and any ambiguity must be resolved in favor of the taxpayer. See, *554 e.g., Andersen Consulting, LLP v. Gavin , supra, 255 Conn. at 511, 767 A.2d 692 ; Zachs v. Groppo , supra, 207 Conn. at 689, 542 A.2d 1145. We conclude, therefore, that the trial court properly determined that earnings from the sale and lease of equipment and equipment installation and maintenance are not subject to taxation under § 12-256 (b) (2).
B
We next address the plaintiff's claim, made in its cross appeal, that the trial court improperly determined that its gross earnings from the sale of DVR service and the imposition of payment related fees are subject to the tax imposed by § 12-256 (b) (2). We agree with the plaintiff that the gross earnings from the sale of DVR services are not subject to the tax, but reject its claim with respect to payment related fees.
We first consider whether payments from subscribers for DVR service clearly constitute "gross earnings from ... the transmission to subscribers in this state of video programming by satellite" under § 12-256 (b) (2).
**308 The plaintiff submitted an affidavit to the trial court averring that "DVR service is provided through a device leased to the subscriber that combines a receiver with a computer-type hard drive. This device ... record[s] video programming transmitted to the subscriber's receiver, which allow[s] the subscriber to view the video programming on the subscriber's own schedule. The DVR service function[s] only after the video programming [has] been delivered to the subscriber by satellite." In addition, the affidavit averred that, "[w]hile the bulk of [the plaintiff's] gross earnings from subscribers were from its sale of [television] programming and pay-per-view movies and/or events, [the plaintiff] also received gross earnings from subscribers for other goods and services that did not constitute video programming transmitted by satellite," including DVR service. The commissioner concedes these factual assertions.
Although DVR service requires the prior transmission of video programming, we conclude that there is at least a plausible argument that DVR service is a separate and distinct operation from "the transmission to subscribers in this state of video programming by satellite ...." General Statutes § 12-256 (b) (2). The capability of recording video programming is not the same thing as the capability of receiving transmissions of video programming in the first instance. Indeed, according to the undisputed averments in the plaintiff's affidavit, subscribers pay for DVR service in addition to the transmission of the programming that is recorded with the DVR device. It would be anomalous to conclude that subscribers pay for the same service twice. Because § 12-256 (b) (2) is ambiguous as to whether it was intended to impose a tax on gross earnings from the provision of DVR service, we must construe the statute in the plaintiff's favor. See Andersen Consulting, LLP v. Gavin , supra, 255 Conn. at 511, 767 A.2d 692 ; Zachs v. Groppo , supra, 207 Conn. at 689, 542 A.2d 1145. Accordingly, we conclude that **309 the trial court improperly determined that such earnings are subject to taxation.
We next consider whether payment related fees for the failure of a subscriber to pay bills on time, for reconnecting the subscriber after being disconnected for nonpayment, and for certain types of payment plans are subject to the gross earnings tax imposed by § 12-256 (b) (2). We conclude that, just as charges to subscribers to recover the tax imposed by § 12-256 (b) (2) are subject to taxation under that statute because such charges are clearly part and parcel of the taxed business operation, *555 i.e., "the transmission to subscribers in this state of video programming by satellite"-which the plaintiff concedes-the imposition of payment related fees is clearly part and parcel of that operation.[22] Cf. Texaco Refining & Marketing Co. v. Commissioner of Revenue Services , supra, 202 Conn. at 592-93, 522 A.2d 771 (rejecting claim that moneys collected from consumers to recover payment of gross earnings taxes on sale of petroleum products are not "earnings from the sale of petroleum products"). In other words, unlike the sale and lease of equipment and equipment maintenance and installation, the imposition of payment related fees is not a stand-alone business operation that is separate and distinct from the transmission of video programing. Accordingly, we conclude that the trial court properly determined that payment related fees are subject to taxation under § 12-256 (b) (2).
III
Finally, we address the plaintiff's claim, also made in its cross appeal, that the trial court improperly determined **310 that the plaintiff was not entitled to interest on the refund pursuant to § 12-268c (b) (1) because § 12-268l governs interest awards in cases in which a taxpayer has appealed from the commissioner's denial of a claim for a refund, and the plaintiff made no claim that it was entitled to interest pursuant to that statute.[23] The commissioner disputes this claim and further contends that, even if § 12-268c (b) (1) applies, the trial court properly determined that the plaintiff is not entitled to interest on the refund award because the plaintiff waived any claim for interest by failing to request it in the joint stipulation of damages. We conclude that the trial court properly determined that § 12-268l applies when a taxpayer has appealed from the denial of a refund claim. We further conclude that the court properly determined that the plaintiff was not entitled to an interest award pursuant to § 12-268l because it never made a claim pursuant to that statute.[24]
Whether § 12-268c (b) (1) or § 12-268l applies in cases in which a taxpayer has appealed from the commissioner's denial of a refund claim is a question of statutory interpretation subject to plenary review. See, e.g., Perez-Dickson v. Bridgeport , supra, 304 Conn. at 507, 43 A.3d 69. We begin our analysis with the language of the relevant statutes. Section 12-268c (a) (1) authorizes certain taxpayers that believe that they have overpaid their taxes to **311 "file a claim for refund in writing with the commissioner within three years from the due date for which such overpayment was made ...." Section 12-268c (b) (1) provides that, "[t]o any refunds granted as a result of overpayments of any taxes under *556 chapter 210, 211 or 212, except refunds due because of any intentional overpayment, there shall be added interest at the rate of two-thirds of one per cent for each month or fraction of a month, as provided in subdivisions (2) and (3) of this subsection."
Section 12-268l authorizes a taxpayer that is aggrieved by an order of the commissioner to "take an appeal therefrom to the superior court for the judicial district of New Britain ...." Section 12-268l further provides that the trial court "may grant such relief as may be equitable and, if such tax has been paid prior to the granting of such relief, may order the Treasurer to pay the amount of such relief, with interest at the rate of two-thirds of one per cent per month or fraction thereof to the aggrieved taxpayer."
Thus, § 12-268l authorizes the trial court to award interest when the tax assessment that is disputed on appeal "has been paid prior to the granting of ... relief ...." By its very nature, therefore, the interest provision of § 12-268l applies when, and only when, the trial court concludes that the taxpayer is entitled to a refund . Accordingly, if this interest provision does not apply to an appeal from the commissioner's denial of a refund claim filed pursuant to § 12-268c (a) (1), we would be hard-pressed to imagine when it would apply.[25] Put another way, if the interest provision of **312 § 12-268c (b) (1) applies when the trial court has ordered a refund pursuant to § 12-268l , the provision of § 12-268l authorizing the trial court to award interest when, and only when, a taxpayer is entitled to a refund would be superfluous. It is well settled that "statutory interpretations that render language superfluous are disfavored ...." (Citation omitted; internal quotation marks omitted.) Commissioner of Correction v. Freedom of Information Commission , 307 Conn. 53, 70, 52 A.3d 636 (2012).
We conclude, therefore, that § 12-268c (b) (1) requires the commissioner to add interest to refunds that he has granted , and it does not apply when the commissioner has denied a refund and the taxpayer has appealed from the ruling pursuant to § 12-268l . Indeed, § 12-268c (a) (4) expressly recognizes that § 12-268l governs appeals from rulings on refund claims filed pursuant to § 12-268c (a) (1).[26]
*557 See General Statutes § 12-268c (a) (4) ("[t]he action of the commissioner on the company ... protest shall **313 be final upon the expiration of one month from the date on which he mails notice of his action to the company ... unless within such period the company ... seeks judicial review of the commissioner's determination pursuant to section 12-268l ").
The plaintiff contends, however, that even if § 12-268l governs interest awards in cases in which a taxpayer has appealed from the denial of a claim for a refund, that statute does not merely authorize the trial court to award interest in its equitable discretion. Rather, the plaintiff contends, the word "may," as used in the phrase "may order the Treasurer to pay the amount of such relief, with interest at the rate of two-thirds of one per cent per month or fraction thereof," is mandatory. See State ex rel. Markley v. Bartlett , 130 Conn. 88, 93, 32 A.2d 58 (1943) ("in a statute conferring power and authority for the benefit of the public, or of a third person, or of individuals generally, the word may is used, it shall be construed as equivalent to shall, and that the statute is mandatory and not permissive or discretionary" [internal quotation marks omitted] ). We decline to review this claim, however, because the plaintiff never sought interest pursuant to § 12-268l in the trial court or claimed that the interest provision of that statute was mandatory.[27] See **314 State v. Devalda , 306 Conn. 494, 504, 50 A.3d 882 (2012) ("this claim is unpreserved for appellate review and, therefore, unreviewable" [internal quotation marks omitted] ). We note in this regard that, even if the plaintiff were correct that § 12-268l mandates that the trial court award interest on refunds, the statute cannot be construed as requiring the trial court to grant the same interest award that the commissioner would have been required to grant pursuant to § 12-268c (b) (1) if he had granted the refund in the first instance, because the methods of calculating interest set forth in §§ 12-268l and 12-268c (b) are different. Compare General Statutes § 12-268l (authorizing trial court to order payment of interest at *558 rate of two-thirds of one percent per month or fraction of month), with General Statutes § 12-268c (b) (requiring commissioner to pay interest at rate of two-thirds of one percent per month or fraction of month, but excluding ninety days from interest period).[28] Accordingly, the plaintiff's failure to request an interest award pursuant to § 12-268l cannot be deemed a mere technicality in light of its request for interest pursuant to § 12-268c (b) (1). **315 The plaintiff also contends that, if the interest provision of § 12-268l is discretionary, that statute cannot apply when the trial court has ordered a refund following the denial of a claim filed pursuant to § 12-268c (a) (1) because the legislature could not have intended to encourage the commissioner to deny meritorious refund claims and "force taxpayers into court where a discretionary award of interest is far less likely." Even if we were to assume that interest awards pursuant to § 12-268l are discretionary, however, we would not find the plaintiff's argument persuasive. This court has held that, even when interest awards are discretionary, there is no requirement that the party seeking interest prove wrongfulness above and beyond the unlawful detention of the payment in order for the trial court to have the discretion to award interest. Cf. DiLieto v. County Obstetrics & Gynecology Group, P.C. , 310 Conn. 38, 53 n.13, 74 A.3d 1212 (2013) ("interest may be awarded in the discretion of the trial court [pursuant to General Statutes § 37-3a ] even when the liable party's failure to pay the judgment was not blameworthy, unreasonable or in bad faith"). Although "a trial court properly may consider the relative merit of an appeal when weighing the equities"; id., at 56 n.15, 74 A.3d 1212 ; the primary equitable factor that the court must consider when exercising its discretion to award interest is the policy of "compensat[ing] parties that have been deprived of the use of their money." Id., at 53 n.13, 74 A.3d 1212. We believe that the legislature reasonably could have concluded that an interest award should not be automatic in cases in which the commissioner denies a refund claim filed pursuant to § 12-268c and the taxpayer ultimately prevails on appeal, but, rather, should be based on equitable factors, with significant weight being given to the taxpayer's interest in being compensated for the loss of the use of its money.
The judgments are reversed only with respect to the taxability of the plaintiff's gross earnings from DVR
**316 service and the case is remanded with direction to render judgments sustaining the plaintiff's appeals as to that issue; the judgments are affirmed in all other respects.
In this opinion the other justices concurred.

General Statutes § 12-256 (b) provides in relevant part: "Each person operating a community antenna television system under chapter 289 or a certified competitive video service pursuant to sections 16-331e to 16-331o, inclusive, and each person operating a business that provides one-way transmission to subscribers of video programming by satellite, shall pay a quarterly tax upon the gross earnings from (1) the lines, facilities, apparatus and auxiliary equipment in this state used for operating a community antenna television system, or (2) the transmission to subscribers in this state of video programming by satellite or by a certified competitive video service provider, as the case may be...."

The plaintiff filed two separate tax appeals with the trial court pursuant to General Statutes § 12-268l , one relating to the commissioner's denial of a refund with respect to the plaintiff's tax payments for the first, second, third, and fourth quarters of 2006, and the first quarter of 2007, and the other relating to the denial of a refund with respect to tax payments for the third and fourth quarters of 2010 and the first quarter of 2011. The trial court consolidated the appeals for purposes of briefing and argument. After the trial court rendered judgment in favor of the plaintiff in each case, the commissioner appealed to the Appellate Court, and the plaintiff filed separate appeals in each case. The Appellate Court consolidated the plaintiff's appeals and treated that consolidated appeal as a cross appeal. We then transferred the commissioner's appeal, and the plaintiff's cross appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

General Statutes § 12-268i provides in relevant part: "Any taxpayer aggrieved by the action of the commissioner or his authorized agent in fixing the amount of any tax, penalty or interest provided for by chapter 210, 211 or 212 or this chapter may apply to the commissioner, in writing, within sixty days after the notice of such action is delivered or mailed to it, for a hearing and a correction of the amount of such tax, penalty or interest so fixed, setting forth the reasons why such hearing should be granted and the amount in which such tax, penalty or interest should be reduced...."

General Statutes § 12-268c (a) (1) provides in relevant part: "Any company included in section 12-249, 12-256 or 12-264... believing that it has overpaid any taxes due under the provisions of chapter 210, 211 or 212 may file a claim for refund in writing with the commissioner within three years from the due date for which such overpayment was made, stating the specific grounds upon which the claim is founded...."
We note that § 12-268c was amended in 2013. See Public Acts 2013, No. 13-232, § 1; see also footnote 23 of this opinion. For the purpose of clarity, unless otherwise noted, we refer to the current revision of the statute.

General Statutes § 12-268c (b) (1) provides: "To any refunds granted as a result of overpayments of any taxes under chapter 210, 211 or 212, except refunds due because of any intentional overpayment, there shall be added interest at the rate of two-thirds of one per cent for each month or fraction of a month, as provided in subdivisions (2) and (3) of this subsection."

For purposes of this opinion, we refer to the plaintiff's transmission of video signals to satellites and the subsequent transmission of the programming to subscriber's antennae as "programming services." Cf. footnote 7 of this opinion.

For purposes of this opinion, we refer to goods and services other than programming services as "nonprogramming goods and services." Cf. footnote 6 of this opinion.

Although the plaintiff presumably filed tax returns for every quarter during the relevant period, these are the only tax periods that are presently at issue on appeal.

General Statutes § 12-268g provides in relevant part: "The commissioner shall, within three years after the due date for the filing of a return, or, in the case of a completed return filed after such due date, within three years after the date on which such return was received by him, examine it and, in case any error is disclosed by such examination, shall, within thirty days after such disclosure, notify the taxpayer thereof...."

General Statutes § 12-268l provides in relevant part: "Any taxpayer aggrieved because of any order, decision, determination or disallowance of the Commissioner of Revenue Services ... may, within one month after service upon the taxpayer of notice of such order, decision, determination or disallowance, take an appeal therefrom to the superior court for the judicial district of New Britain ...."
As we have indicated, the plaintiff filed two separate tax appeals pursuant to § 12-268l , which the trial court subsequently consolidated. See footnote 2 of this opinion. The plaintiff nonetheless continued to file separate motions in each appeal, and the trial court ultimately rendered a separate decision in each case. Because these documents were substantially identical in each case, in the interest of simplicity, we refer to them in the singular.

The commissioner conceded in his memorandum in support of his motion for partial summary judgment that fees received by the plaintiff for subscriptions to Dish Magazine are not taxable under § 12-256 (b) (2). Accordingly, the phrase "nonprogramming services," as used hereinafter in this opinion, does not include such subscriptions.

Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) pp. 171, 251, defines "community antenna television" as "cable television," which, in turn, is defined as "a system of television reception in which signals from distant stations are picked up by a master antenna and sent by cable to the individual receivers of paying subscribers ...."

Although the commissioner claimed in the trial court that the court lacked subject matter jurisdiction over the plaintiff's claim for a refund for the audited tax periods under the doctrine of exhaustion of administrative remedies, the commissioner does not dispute that the trial court had jurisdiction over the plaintiff's refund claim if § 12-268c provides an alternative route for seeking a refund of overpayments made during the audited tax periods. Accordingly, the determination as to whether § 12-268i provides the exclusive procedure for seeking a refund under these circumstances must be made before addressing the commissioner's claim that the plaintiff failed to exhaust its administrative remedies pursuant to § 12-268i.

General Statutes § 12-39s (b) provides in relevant part: "The Commissioner of Revenue Services, of his own motion, is authorized, if the commissioner determines that any tax, penalty or interest has been paid more than once or has been erroneously or illegally collected or computed, to credit such amount against any amounts then due and payable from such person to said commissioner and to refund, upon order of the Comptroller, the balance, if any, to such person...."

We acknowledge but reject the commissioner's arguments that the plaintiff has failed to present a proper cross appeal and failed to adequately brief its claims.

The commissioner makes no claim that we must defer to his interpretation of § 12-256 because that interpretation has previously been subjected to judicial review or is time-tested. See Board of Selectmen v. Freedom of Information Commission , 294 Conn. 438, 446, 984 A.2d 748 (2010) ("we will defer to an agency's interpretation of a statutory term only when that interpretation of the statute previously has been subjected to judicial scru-tiny or to a governmental agency's time-tested interpretation and is reasonable").

The phrase "such operations," as used in the third sentence of § 12-256 (b), cannot refer to the word "operations," as used in the second sentence, because, as we have explained, the most reasonable interpretation of that word is that it is modified by the phrase "related to commissions, rebates, or other payments," and it refers to the operations for which deductions are not allowed. The statute cannot mean that the taxpayer must submit to the commissioner a form listing "the total amount of gross earnings derived from [operations for which deductions are not allowed]." Even if the word "operations," as used in the second sentence of § 12-256 (b), refers to the "transmission to subscribers in this state of video programming by satellite," however, nothing in the third sentence expands that meaning.

In the stipulation, the parties set forth two alternative methods for allocating earnings from the sale of "bundle[s]" that include both programming services and nonprogramming services, and asked the trial court to decide which was correct. The commissioner contended that all of the earnings from the sale of bundled services should be allocated to programming services. The trial court rejected that argument, agreeing instead with the plaintiff's contention that earnings should be allocated to programming services and nonprogramming goods and services according to the plaintiff's internal accounting policies. The commissioner did not contend in the trial court, and does not seriously contend on appeal, that these accounting policies do not accurately reflect the nature of the products that are being charged.

As we have explained, in the present case, the trial court concluded that the fact that § 12-256 (b) (2) does not contain language similar to the language of § 12-256 (b) (1), which imposes a tax on the gross earnings from "the lines, facilities, apparatus and auxiliary equipment in this state used for operating a community antenna television system," shows that the legislature did not intend to impose a tax on the sale and lease of equipment or equipment installation and maintenance by a business that provides one-way transmission of video programming by satellite. The record does not reveal, however, whether the sale and lease of equipment and equipment installation and maintenance are subject to taxation under § 12-256 (b) (1), or whether that tax is limited to gross earnings derived from a business' use of its own lines, facilities, apparatus and auxiliary equipment. Accordingly, we conclude that § 12-256 (b) (1) sheds little light on the meaning of § 12-256 (b) (2).

The commissioner makes no claim that, when a tax statute is ambiguous on its face, but its meaning can be clarified by considering the legislative history, there is no requirement that the statute be strictly construed in favor of the taxpayer. See, e.g., Envirotest Systems Corp. v. Commissioner of Motor Vehicles , 293 Conn. 382, 389-90, 978 A.2d 49 (2009) (because statutes in derogation of sovereign immunity must be strictly construed, courts may not consult extratextual sources in construing ambiguous statute, but must construe statute as preserving sovereign immunity); but see State v. Panek , 328 Conn. 219, 242, 177 A.3d 1113 (2018) ("[i]t is well established that courts do not apply the rule of lenity unless a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute" [internal quotation marks omitted] ). Even if we were to assume that we may consult the legislative history of § 12-256 (b) (2), however, it sheds no light on the question presently before us.

Indeed, this argument was made by the opponents of a legislative attempt in 2017 to amend § 12-256 to impose a tax on earnings from all operations of satellite television providers. The proposed legislation would have amended § 12-256 (b) by adding the following provision: "For purposes of this subdivision, receipts from subscribers include, but are not limited to, all revenues received by a system, service or business described in this subdivision from sales or rentals of equipment related to the operation or use of such system, service or business, including, but not limited to, all charges related to the installation, maintenance and repair of such equipment." Raised Bill No. 7312, 2017 Sess., § 2. Nicholas Green, acting on behalf of the plaintiff in the present case, submitted written testimony to the Finance, Revenue and Bonding Committee opposing the enactment of the quoted portion of Raised Bill No. 7312. Conn. Joint Standing Committee Hearings, Finance, Revenue and Bonding, Pt. 5, 2017 Sess., p. 2487. Green stated that the proposed legislation would levy "a new tax on 175,000 Connecticut families that subscribe to satellite [television]" and would increase the average subscriber's tax burden to $10 per month, or by approximately 20 percent. Id. Green also pointed out that an appeal in the present case was pending, and he urged the committee to postpone approving any new legislation until this case was resolved. Id., p. 2488. Megan Kueck, manager of state and local government affairs for the Satellite Broadcasting and Communications Association, stated in written testimony that the proposed legislation would "increase the cost of service for every [Connecticut] satellite [television] customer" and would "unfairly [make] the new tax on [non]programming products and services retroactive ...." Id., p. 2524. In addition, Kueck's written testimony stated that this bill would "detrimentally affect the state's economy in multiple ways," including reducing the demand for satellite television service, to which nearly 175,000 families in the state subscribe. Id. The commissioner submitted written testimony in favor of the proposed legislation stating that "[s]atellite [television] sellers should not have a competitive tax advantage over cable and video providers of what is really the same service." Id., p. 2458. The commissioner did not contend that the proposed legislation merely clarified the original intent of § 12-256 (b) (2). The portion of the proposed legislation that would have amended § 12-256 (b) (2) was not included in the substitute house bill that was favorably reported out of committee. See Substitute Bill No. 7312, 2017 Sess.
We recognize that, "[o]rdinarily, we are reluctant to draw inferences regarding legislative intent from the failure of a legislative committee to report a bill to the floor, because in most cases the reasons for that lack of action remain unexpressed and thus obscured in the mist of committee inactivity." (Internal quotation marks omitted.) State v. Miranda , 245 Conn. 209, 231 n.24, 715 A.2d 680 (1998), overruled on other grounds by State v. Miranda , 274 Conn. 727, 878 A.2d 1118 (2005) ; but see In re Valerie D. , 223 Conn. 492, 521-23, 613 A.2d 748 (1992) (when one version of proposed legislation was favorably reported out of committee and another version of proposed legislation died in committee, court concluded that legislators were "persuaded by the policy arguments of [the successful legislation] and the opponents [of the unsuccessful legislation]"). It is difficult to understand, however, why the commissioner would have urged the adoption of new legislation subjecting all earnings of satellite television providers to a gross earnings tax if § 12-256 (b) already imposed such a tax, or why the Finance, Revenue and Bonding Committee would have rejected the proposed legislation if it believed that the legislature's original intent was to impose such a tax.

We note that the plaintiff makes no claim that payment related fees are not subject to taxation under § 12-256 (b) (2) because they are related to the lease of equipment or the installation and maintenance of equipment. Rather, the plaintiff claims that a fee for a late payment for programming services, for example, is not a fee for programming services.

We note that the commissioner appears to believe that General Statutes (Rev. to 2007) § 12-268c (b) (1) would apply if we were to agree with the plaintiff's claim. The current revision of § 12-268c (b) (1), however, is "applicable to refunds issued on or after [July 1, 2013]"; Public Acts 2013, No. 13-232, § 1; and the plaintiff relied on the current revision in the trial court. Because the commissioner has not explained why the current revision would not apply if we were to agree with the plaintiff's claim on appeal, we continue to apply the current revision of that statute. See footnote 5 of this opinion.

Accordingly, we need not address the question of whether the trial court properly determined that the plaintiff was barred from seeking an interest award because it voluntarily agreed to the stipulation of damages, which did not include a request for interest.

We note that § 12-268c (a) (1) permits "[a]ny company ... believing that it has overpaid any taxes due under the provisions of chapter 210, 211 or 212 [to] file a claim for refund ...." Section 12-268l authorizes "[a]ny taxpayer aggrieved [by an] order ... of the [c]ommissioner ... made under the provisions of chapter 210, 211 or 212" to appeal from the order. Thus, § 12-268l does not authorize appeals from any rulings on refund claims except rulings made pursuant to § 12-268c. Moreover, a taxpayer must file a request for a refund pursuant to § 12-268c before seeking a refund pursuant to § 12-268l . See Allen v. Commissioner of Revenue Services , 324 Conn. 292, 300, 152 A.3d 488 (2016) ("[c]ompliance with the refund statute is a condition precedent to availing oneself of the limited statutory waiver of sovereign immunity provided by the appeal statute"), cert. denied, --- U.S. ----, 137 S.Ct. 2217, 198 L.Ed.2d 659 (2017).

We recognize that this interpretation creates a conundrum. Namely, in a case in which the commissioner granted a claim for a refund, but refused to add interest as required by § 12-268c (b) (1), the taxpayer could seek relief from that ruling by appealing to the trial court pursuant to § 12-268l , in which case, the commissioner could contend that § 12-268c (b) no longer applied. In that situation, however, we have little doubt that, even assuming that an interest award pursuant to § 12-268l is discretionary-an issue that, as we discuss subsequently in this opinion, we need not decide here-it would be an abuse of discretion for the trial court to refuse to award interest pursuant to that statute. Indeed, the commissioner makes no claim in the present case that he has any authority to refuse to pay interest on a refund that he has granted pursuant to § 12-268c. As we also discuss subsequently in this opinion, we recognize that the method of calculating interest under § 12-268l is different from the method under § 12-268c (b). Because § 12-268l allows for a larger interest award, however, the taxpayer would not be harmed in this situation.

The plaintiff stated in a footnote in its reply to the commissioner's objection to its motion for interest that, "[s]ince ... § 12-268c (b) clearly and specifically addresses the issue of interest on refunds of the satellite gross earnings tax, it is the controlling statute." The plaintiff then noted that "equity calls for the award of interest in any event. While [the commissioner] attempts to lay responsibility for the length of this litigation on [the plaintiff], the record is clear that: (i) [the plaintiff] repeatedly requested schedules and hearings in an effort to speedily resolve this litigation, only to be met with [the commissioner's] persistent objections; and (ii) [the plaintiff] supplied tremendous amounts of data to [the commissioner] in a good faith effort to come to an agreement on the amount of the refund due, both voluntarily and in response to formal discovery, ultimately fostering the parties' agreement on the amount of the refund." The plaintiff did not claim in the alternative, however, that § 12-268l applied. Nor did the plaintiff claim, as it does on appeal, that the interest provision of § 12-268l is mandatory. Rather, the plaintiff appears to have been suggesting that, even if , as the commissioner had contended in his opposition to the plaintiff's motion for interest, § 12-268l applies to claims for interest in appeals from the commissioner's denial of a refund claim, the equities weighed in favor of an interest award. This is a factual question, however, that would have required the presentation of evidence, and the plaintiff never requested an evidentiary hearing on the issue in the trial court.

General Statutes § 12-268c (b) provides in relevant part: "(1) To any refunds ... there shall be added interest at the rate of two-thirds of one per cent for each month or fraction of a month, as provided in subdivisions (2) and (3) of this subsection.
"(2) In case of such overpayment pursuant to a tax return, no interest shall be allowed or paid under this subsection on such overpayment for any month or fraction thereof prior to (A) the ninety-first day after the last day prescribed for filing the tax return associated with such overpayment, or (B) the ninety-first day after the date such return was filed, whichever is later.
"(3) In case of such overpayment pursuant to an amended tax return, no interest shall be allowed or paid under this subsection on such overpayment for any month or fraction thereof prior to the ninety-first day after the date such amended tax return was filed."